569 So.2d 1177 (1990)
Charlotte D. Ethridge BALL
v.
Laverne D. SLOAN.
No. 07-CA-59649.
Supreme Court of Mississippi.
October 17, 1990.
Rehearing Denied November 21, 1990.
J. Dewayne Thomas, Roger K. Doolittle, Jackson, for appellant.
Mildred M. Morris, Jimmie B. Reynolds, Jr., Steen Reynolds Dalehite & Currie, Jackson, for appellee.
En Banc.
BLASS, Justice, for the Court:
This case is an appeal from the Circuit Court of the First Judicial District of Hinds *1178 County and grew out of a two-car collision at an intersection in Jackson, Mississippi. The case was tried on August 4, 1988, and the jury returned a verdict for the defendant Sloan. The trial court overruled the motion for j.n.o.v. and for a new trial on August 31, 1988, and Ball has appealed.
Two issues are raised on the appeal. (1) Was Rule 608(b) M.R.E. violated? and (2) Did the trial court commit reversible error in overruling objections to defense counsel's closing argument?
Following the accident on September 30, 1986, plaintiff, Charlotte Ball, went to the Emergency Room at the Hinds General Hospital where she remained forty-five minutes to an hour. X-rays were taken and she was given a shot, presumably for pain. She had been involved in two previous wrecks while living in Ohio; one in 1977 and the other in 1981. She had received some injuries in 1977 which resulted in surgery.
After her visit to the emergency room, she saw her family physician, Dr. Patterson, who did an ultra-sound treatment on her and gave her some medication for muscle relaxing. Dr. Patterson sent her to Dr. Hodges, a neurosurgeon. He found nothing wrong with her. She returned to Dr. Patterson who put her in the hospital because her muscles were tense. Further x-rays were done and a CT Scan was made but these tests revealed nothing that could be causing the pain. She was then sent to Dr. Songcharoen, a specialist in arthritis. He found no cause for her pain and sent her to Dr. Stringer, a neurosurgeon. The tests he ran had normal results and he was unable to find the cause of her pain. In May of 1987, she employed an attorney who sent her to Dr. Foxworth, a chiropractor. After treating her two and a half weeks, he was unable to help her and referred her to Dr. Slipman. Dr. Slipman is described as a physician with a specialty in the treatment of chronic pain and he performed an electrodiagnostic test. She saw him for the first time on July 20, 1987, where she complained of persistent headaches, neck pain, upper back pain and low back pain, with other symptoms as well. She had not complained to any of the other doctors about headaches. Dr. Slipman placed her in the Methodist Rehabilitation Center for nineteen days and, at discharge she was "80% to 90% better in terms of her neck, upper and low back pain." The headaches persisted. Dr. Slipman referred her to Dr. Penzien at the Headache Clinic at University Medical Center. At the time of trial, she had not seen him.
Plaintiff experienced some numbness in her right hand and Dr. Slipman sent her to Dr. Gorman who determined that she was suffering from right Carpel Tunnel Syndrome. He performed surgery to correct that problem. Dr. Slipman testified that the Carpel Tunnel Syndrome could have resulted from the accident but Dr. Stringer testified that he had never seen it as a result of a single traumatic incident that did not involve a fracture of the wrist. Plaintiff claimed that she could not do her housework and that she had to stay in bed at least two days a week because of her headaches. A vocational rehabilitation counselor testified that she suffered wage loss, past and future, of $48,880. He pointed out, however, that Dr. Slipman was the only doctor who listed any restriction. The wage estimate was based on potential earnings because, at the time of the accident, Ball was unemployed. She had expected to start to work at a convenience store. According to counselor Brawner, she was capable of handling that position in her present state.
As stated above, the jury found for the defendant.
Addressing the evidence question first, the record shows that all of Ball's medical records, including clinical and laboratory reports, doctors' statements, and hospital records were introduced as a joint exhibit at the request of the plaintiff. One sheet that contained handwritten notations shows the following typed notation:
8-29-87: Pharmacist notified us that prescription for Tenuate has been altered to read # 75 with refills.
Another sheet contains the following handwritten notation:

*1179 8-29-87
Altered prescription for Tenuate from 15 to 75 marked refills.
The only possible revelance of the testimony about altered prescriptions was that it might have had some bearing on the plaintiff's credibility. Under our rule, however, specific instances of conduct of a witness, other than the conviction of a crime, may not be proved by extrinsic evidence. Rule 608(b), M.R.E. This rule goes on to say, "it may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." On cross-examination, defense counsel asked Ball if she had ever altered a prescription given her by one of the doctors. She testified that she had not. Under the strict language of the rule, and as this Court has interpreted it, the examination should have stopped, as to that issue, at that point. Pinson v. State, 518 So.2d 1220 (Miss. 1988); United States v. Edwards, 549 F.2d 362 (5th Cir.1977). See also annotation, Construction and Application of Rule 608(b) of Federal Rules of Evidence, Dealing with Use of Specific Instances of Conduct to Attack or Support Credibility, 36 A.L.R.Fed. 564 (1978). The conduct of counsel for defense in proceeding further, including the calling of a pharmacist to testify that he had refused to fill two prescriptions for the plaintiff appears to us to be in the clear contravention of Rule 608(b), M.R.E. The trial judge was of the opinion, however, that the door was opened to this inquiry by the admission of the medical records, which contained a note on the alteration of a prescription.
In our view of this case, it is unnecessary for us to determine whether or not the "door was opened," because we are of the opinion that the error, if any, was harmless in the light of extensive medical evidence set out in the record. We note, also, in Rule 103(a), M.R.E., where it is stated: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected ...". It was established that the prescriptions involved were for Tenuate, which is a diet drug or appetite suppressant and had nothing whatever to do with the plaintiff's alleged injuries. We do not see how any substantial right of the plaintiff was affected. There was clearly, however, sufficient evidence bearing on plaintiff's injuries or the lack thereof to support the verdict of the jury.
With regard to the second question, having to do with the argument of counsel, it is well settled in Mississippi that attorneys are afforded considerable latitude in their closing arguments. Copiah Dairies, Inc. v. Addkison, 247 Miss. 327, 153 So.2d 689 (1963); Shell Oil Co. v. Pou, 204 So.2d 155 (Miss. 1967). Defense counsel did refer to the fact that the prescriptions had been altered which would have been better left unsaid. He also argued that no physician had found anything specific wrong with Ms. Ball, which was reasonably supported by the record. He stated that some people might say that this lawsuit was a lawyers' lawsuit. We are unwilling to undertake to set specific and detailed limits on the argument which an attorney might make in this kind of lawsuit. We recognize that counsel, for both sides, are and are expected to be, partisan advocates and are of the opinion that the argument did not exceed the broad latitude allowed.
AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, and ANDERSON, JJ., concur.
HAWKINS and DAN M. LEE, P.JJ., and SULLIVAN and PITTMAN, JJ., dissent.
HAWKINS, Presiding Justice, dissenting:
At trial Ball's medical records, including clinical and laboratory reports, doctors' statements and hospital records, were introduced as a joint exhibit at request of the plaintiff.
*1180 One sheet, containing handwritten notations shows the following typed notation:
8-29-87: Pharmacist notified us that prescription for Tenuate has been altered to read # 75 with refills.
Another sheet contains the following handwritten notation:
8-29-87
Altered prescription for Tenuate from 15 to 75 marked refills.
When Ball was testifying as a witness, she was asked on cross-examination: "Isn't it a fact, also, that you altered a prescription that one of the doctors had given you." She replied, "No, sir, I have never."
The August 29, 1987, notations were among the sheets from the clinical records from a physician's office. The notations in and of themselves would convey very little information.
In her defense Sloan called Robert Berryhill, a pharmacist, who was permitted to testify over defense objection that Ball had twice presented to him prescriptions which he refused to fill. One of the prescriptions she presented for a refill was introduced into evidence.
In closing argument, in arguing that Ball was not a truthful person, defense counsel argued among other things, "Why not admit to having altered prescriptions?" Plaintiff's counsel objected, and the court overruled the objection.
Tenuate is a diet drug for treatment of obesity. It is clearly a drug which has nothing to do with Ball's injuries, and was never prescribed in treatment for her injuries.
It was the view of the circuit judge that because Ball's medical records showing the above notation had been introduced, this opened the door to this collateral inquiry.
As the majority concedes, questioning Ball about the altered prescription was irrelevant and extrinsic, and clearly violated Rule 608(b) Mississippi Rules of Evidence (MRE).[1]Pinson v. State, 518 So.2d 1220, 1223 (Miss. 1988); United States v. Herzberg, 558 F.2d 1219 (5th Cir.1977), cert. denied, Herzberg v. U.S., 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); Carter v. Hewitt, 617 F.2d 961 (3rd Cir.1980); United States v. Espinal, 757 F.2d 423 (1st Cir.1985).
The majority goes on to note, however, that it was "harmless error."
One of my mentors as a fledgling district attorney (I required several), was the district attorney of the First Circuit Court District, as astute a judge of human nature as I ever met. He introduced me to the saying, "The jury convicted him of lying." What he meant, of course, was that even if the State had a dubious case on guilt, if the jury got it into their heads the defendant had flat out lied during his testimony, they got disgusted with him and "convicted him of lying." There was no better way to get a jury to ignore the relevant issue of guilt or innocence than to get it into their heads the defendant was a bald-faced liar. It is one of the characteristics of human nature that we can feel little sympathy for any supplicant who is at the same time outright lying to us.[2] Thus, any good cross-examiner tries to catch a witness, especially a party, in at least one lie, whether it is material or not.
And of course, courts have consistently held that convictions of any crime were proper cross-examination to impeach a witness's *1181 credibility, a clear recognition that it was quite impressive on a jury's mind whether or not the witness was believable. Miss. Code Ann. § 13-1-13 (1972 Code); Breland v. State, 221 Miss. 371, 73 So.2d 267 (1954); Garraga v. Yellow Cab Co., 222 Miss. 739, 77 So.2d 276 (1955); Nicholson v. State, 254 So.2d 881 (Miss. 1971).
In fact, because of its potential for evil, this rule mercifully has been markedly curtailed. Rule 609 MRE; Johnson v. State, 529 So.2d 577 (Miss. 1988). The witness's credibility, especially a party to a case, is all important.
Calling any error in a jury trial "harmless" requires an omniscience of human nature I have some reluctance to claim. As to this particular error I would be more comfortable asserting precisely the reverse. It used to be the law that evidence erroneously admitted was presumed to be prejudicial unless the contrary was shown. Scarborough v. Smith, 52 Miss. 517 (1876).
Moreover, Ball did not "open the door" by the admission of her medical records into evidence by stipulation. Without questioning her and later calling the pharmacist as a defense witness, the jury, even if it had paid any attention to the notations, would have known nothing about the surrounding circumstances.
Therefore I respectfully dissent.
DAN M. LEE, P.J., and SULLIVAN and PITTMAN, JJ., join this opinion.
NOTES
[1] RULE 608. EVIDENCE OF CHARACTER AND CONDUCT OF WITNESS

(b) Specific Instances of Conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.
[2] Perhaps there are one or two exceptions, a lady being questioned about her age, a man about his motive when caught in an extra-curricular flirtation. Our harshness softens on skirting the truth in these situations.