602 So.2d 817 (1992)
Charles Milton TURNER and Bessie Boyd Turner
v.
Van H. TEMPLE, M.D., David J. Gandy, M.D., Lakeland Orthopedic Clinic, P.A.
No. 89-CA-0753.
Supreme Court of Mississippi.
May 27, 1992.
*818 Alfred L. Felder, McComb, for appellants.
Clifford B. Ammons, James A. Becker, Jr., Frank A. Wood, Jr., Watkins & Eager, Jackson, for appellees.
Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Charles Milton Turner and Bessie Boyd Turner, his wife, filed suit in the Circuit Court of the First Judicial District of Hinds County, Mississippi, alleging medical malpractice against Van H. Temple, M.D. and David L. Gandy, Jr., M.D. in conjunction with a surgical procedure performed on August 2, 1982. The case went to trial on February 13, 1988, and the jury returned a verdict in favor of the defendants. Judgment was entered accordingly and the Turner's motion for a judgment notwithstanding the verdict or in the alternative, a new trial, was denied. The Turner's have appealed to this Court and have presented four issues for decision.

FACTS
Charles Turner, born March 4, 1951, fell and injured his back in October of 1978 while working for Bechtel Construction at the Grand Gulf Nuclear Power Plant. This litigation arose from the last of four surgeries done on Turner in attempts to alleviate his chronic pain resulting from the injury.
After the injury, Turner first went to Dr. Ben Crawford in Tylertown. Dr. Crawford hospitalized Turner and placed him in traction for eleven (11) days. When Turner still complained of pain in his back and left leg, Dr. Crawford sent him to see Dr. Meyer, an orthopedic surgeon in McComb. Dr. Meyer treated Turner conservatively from January until May of 1979, when he finally attempted a spinal fusion operation. After the operation, Turner felt better for a time and then the pain returned. Dr. Meyer then referred Turner to a neurosurgeon, Dr. Glen Warren in Jackson. Dr. Warren performed surgery at Doctors Hospital in Jackson in April of 1980, assisted by Dr. Van Temple, who checked to see if the prior fusion operation had succeeded and found that it had not. After this operation, Turner again improved temporarily but his pain returned. Turner returned to Dr. Warren in February of 1981 and this time Dr. Warren performed a rhizotomy, which means simply that he clipped a nerve believed to be one of the sources of pain.
Turner still did not obtain substantial relief from the pain he was suffering, and he went to Dr. Temple, who had become his primary physician, to see if anything further could be done. Dr. Temple became Turner's primary physician. Turner was admitted to River Oaks Hospital in June or July of 1981 for more tests. Dr. Temple decided that another fusion operation could help Turner and scheduled an operation for October of 1981. Dr. Temple testified that *819 his relationship with Turner had become very close, almost like that of a parent and child. He stated that Turner asked him to have Dr. Warren at the surgery and that he assured Turner that Dr. Warren would be there.
However, Dr. Temple had second thoughts about the operation and cancelled it. Instead, he sent Turner to an orthopedic surgeon in Dallas, Dr. Wharton, who specialized in spinal injuries and operations. One reason Temple wanted Turner to see Dr. Wharton was that since there had already been three surgeries on Turner's back, the amount of scar tissue present would further complicate the operation. Dr. Wharton's expertise allowed him to do spinal procedures from the anterior or front of the body, thereby avoiding the complications associated with working with so much scar tissue.
The trip to Dallas was in October of 1981. Dr. Wharton put Turner in a Rainey-Flexion Vest, which partially immobilized the spine, in order to test whether a spinal fusion operation would help. Turner wore the vest until he returned to Dr. Wharton in March of 1982, and claimed that the vest helped. Dr. Wharton had more tests done, including a psychological evaluation on Turner, then discharged him and told him that he would write Dr. Temple explaining his conclusions to him and Dr. Temple would relay the results to Turner. Turner and his wife were very disappointed at this, since they had gone to Dallas expecting Dr. Wharton to do the surgery.
Shortly after his return from Dallas, Turner returned to Dr. Temple on April 15 and learned that Dr. Wharton had recommended that Turner not have the fusion surgery. Dr. Temple testified that the reason Wharton advised against the surgery was that the psychological evaluation showed that Turner was too depressed to be a good candidate for surgery at that time. Nevertheless, Dr. Temple told Turner that he could still do the surgery. Dr. Temple testified that he told Turner that there was only about a 10% chance that the surgery would help, and that the operation could possibly make him worse. Turner testified that Dr. Temple only told him that the pain might be worse, better or the same and that he did not tell him about the possibility of cord or nerve damage. Both agree that Turner again asked that Dr. Warren attend the surgery and Dr. Temple agreed that Dr. Warren would attend.
However, the surgery was not immediately scheduled. Dr. Temple wanted Turner to think about it and come back for another office visit in June. On June 10, Turner returned and repeated his desire to have the surgery, as well as his request that Dr. Warren be there for the surgery. Dr. Temple again assured Turner that Dr. Warren would be there. However, Dr. Temple wished to wait until a new associate, Dr. David Gandy, arrived, since he had more experience using the Harrington Rod technique planned for Turner's operation. He asked Turner to return in July for an appointment with Dr. Gandy, which Turner did.
Dr. Gandy examined Turner in July and he testified that he warned Turner of the possibility of cord or nerve damage and that the possibility was greater because of the heavy scarring in his back. Turner denied that he was ever warned of the possibility of nerve damage and claimed that the only risk he was warned of was that associated with anesthesia. However, he admitted that he had been warned of the possibility of cord damage when Dr. Meyer performed the first operation on him in 1979. He signed a consent form for the surgery, although he did not read it and it stated merely that the risks had been explained to him and did not specifically list what the risks were.
Both Turner and his wife testified that although Turner experienced a great deal of pain in his lower back and left leg before the surgery and was unable to hold a job, he was able to do most of the things any other person could do. He could walk normally, mow the grass, take care of and play with his children, drive a car, etc. He was able to have somewhat normal sexual relations with his wife, although the pain in his back somewhat limited that. His only *820 other medical problem was that he had some problem with retention in his kidneys, i.e., he had trouble beginning to urinate.
Turner entered River Oaks Hospital in Jackson on August 1, 1982, for the surgery scheduled the following day. The surgery was performed on August 2 by Dr. Temple with Dr. Gandy assisting. Dr. Temple never notified Dr. Warren and he was not present. The method of fusion chosen was the use of Harrington Rods combined with a bone graft. Briefly, the procedure involved the insertion of two stainless steel rods (Harrington Rods) on either side of Turner's spine. The Rods were connected together by hooks and served to hold the spine in place so that the bone graft could take hold and fuse the vertebrae together.
Dr. Temple decided to use two incisions on either side of the spine to insert the Rods, hoping to avoid the complications of working with the scar tissue from the previous operations which had used incisions along the spine. He inserted one of the Rods and Dr. Gandy inserted the other. During the course of the operation, Dr. Temple was working close to the exposed spinal cord when the instrument which he was using, a Cobb elevator, brushed the cord and caused Turner's spine to flex. Other than that incident, the operation went smoothly and according to plans. The operation began at around 8:00 a.m. and ended about noon.
Dr. Temple checked on Turner four times that day after the operation, the last time at about 10:30 p.m. He noted nothing unusual until the last visit, when he noted, "Can rotate legs slightly. Can flex and extend toes. Still can't get him to dorsiflex and plantarflex ankles, but does slightly plantarflex ankles. Sensation okay. Possibly hyeraesthetic  hyperaesthetic both legs at L-5 on the left, but does have rhizotomy on the left. Otherwise, doing very well." This notation is the main basis for this lawsuit; Turner contends that, at that point, Dr. Temple should have been aware that neurological damage was resulting from the operation.
Turner remained in the hospital after the surgery until October 21, 1982. Dr. Temple and Dr. Gandy both testified that the first objective manifestation of possible neurological complications came on August 8. Dr. Temple testified that on that date he noted a tendency toward permanent nerve damage by his observation of hyperaesthesia (increased sensitivity) and soreness in Turner's thighs, calves, feet and toes, more pronounced on the left side. These problems persisted and eventually Turner developed numbness in the lower part of his body and a condition described as drop-foot, where Turner was unable to properly move his feet up and down.
The condition persisted until the time of trial, although some slight improvement had been noted. This condition has greatly affected his ability to walk. He wears special shoes and braces and usually needs a cane to walk; sometimes in unfamiliar places he needs assistance to remain steady. Turner also claims that as a result of the surgery he is numb from the waist down and has reduced sensitivity to hot and cold, pain, etc. He further claims that the he has greatly reduced sexual feeling in his penis and can no longer tell when he ejaculates. Finally, he complains that he has lost the ability to control his bladder and must wear an adult diaper in the front of his pants to help conceal the problem.
Dr. Donald Austin, a neurologist from Detroit, Michigan and Turner's medical expert, testified that Dr. Temple and Dr. Gandy deviated from the standard of care in three different ways. He claimed that (1) the procedure should not have been performed in the first place; (2) the doctors should have monitored Turner during the operation for neurological damage; and (3) the doctors should have realized from their observation on the night of August 2 that a neurological problem had developed and should have immediately removed the Harrington Rods. Dr. Austin's testimony focused primarily on claims two and three.
The monitoring during the operation should have been done, according to Dr. Austin, in order to determine whether the use of the Harrington Rods had put too much pressure on the spinal cord and cauda *821 equina[1], resulting in impairment of neurological function. Dr. Austin testified that Dr. Temple and Dr. Gandy deviated from the standard of care for orthopedic surgeons in not monitoring Turner for signs of neurological damage during the surgery using one of two methods. One method would have been for the anesthesiologist to bring Turner partially out from the anesthesia and ask him to move his legs. Another method would have been to use a device called somatosensory evoked potential which could detect impairments in neurological function. Had they used either of these monitoring techniques, they would have discovered that the placement of the Harrington Rods had put too much pressure on the spinal cord and/or the cauda equina from the L-2 level down, which in Dr. Austin's opinion was the cause of Turner's post-operative problems.
Dr. Austin's other main contention was that Dr. Temple and Dr. Gandy had deviated from the standard of care for orthopedic surgeons when they did not take immediate action for a neurological problem at 10:30 p.m. on August 2. According to Dr. Austin, Dr. Temple's own observations clearly indicated a neurological problem. Dr. Austin testified that Dr. Temple's notes clearly indicate that the Harrington Rods were stretching the spinal cord or the cauda equina too much, resulting in the problems with movement and increased sensitivity. The proper action for Dr. Temple to have taken, according to Dr. Austin, would have been to immediately operate again and loosen the tension on the Harrington Rods. Dr. Austin stated that permanent damage would have resulted if no action was taken in three to five days, since after that time the nerves lose the ability to heal themselves. Therefore, by the time Dr. Temple noticed the decrease in function on August 8, most of the damage was probably already done.
Dr. Temple and Dr. Gandy countered Dr. Austin's testimony with their own and that of two neurosurgeons from Jackson. Dr. Temple testified that the monitoring procedures during the surgery were unnecessary and generally not done. In addition, the wake up test would have been impossible due to the position Turner was placed in for the operation. The somatosensory evoked potential device was not available at River Oaks nor at the University Medical Center, and likewise was unnecessary. As for the problems he noted on August 2, he stated that although they were a cause for concern, he did not feel that any more than continued monitoring was called for. He and Dr. Gandy had tightened the Rods only enough to hold them in place.
If the Rods had been too tight as Dr. Austin contended, Dr. Temple stated that there would have been no doubt that Turner would have been totally numb from the waist down and his bladder and bowels would have been totally uncontrollable. The next day, Dr. Temple noted no significant neurological change from what Turner had before the operation. Dr. Temple stated that at no time did his care and treatment of Turner deviate from the standard of care. In his opinion, the drop foot and any other problems were most likely caused by the extensive scarring that caused the nerves to be compressed.
Dr. Gandy testified to essentially the same facts. He also stated that the monitoring procedures during surgery were unnecessary and that Dr. Temple's observations on August 2 were a cause for concern but not immediate action. In his opinion the Rods were not too tight. He had seen one case where they were too tight and it caused total paralysis. According to Dr. Gandy, Turner's problem would have developed even if the Rods had been removed as suggested by Dr. Austin, because the cause of the problem was extensive scarring that stretched the nerves.
Dr. Walton Stringer, a neurosurgeon, testified for the defense. He stated that the areas of neurosurgery and orthopedics were very closely related in the area of back surgery, and that he saw no need for there to have been a neurosurgeon present at the operation. He saw nothing in the *822 records that indicated that anything had been done wrong, nor did he see anything that he would have done differently. In his opinion, the drop foot was caused by the extensive scarring. He noted from the records that Turner's neurological condition had improved after Dr. Temple noted the areas of concern on August 2, and explained that if the Rods had been too tight, no such improvement would have been shown.
Dr. Michael Vise, also a Jackson neurosurgeon, testified to essentially the same facts and opinions. He did not think that a neurosurgeon was necessary for the operation and saw nothing that he would have done differently had he been present. While he could not definitely say what had caused Turner's condition, he testified that the Rods were not too tight and there was no need to take them out.
Additional facts will be brought out as merited by the discussion of the issues.

DISCUSSION

I. THE LOWER COURT DID NOT ERR IN REFUSING TO GRANT TURNER'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT BASED UPON ASSUMED DUTY OR BREACH OF FIDUCIARY DUTY.
On an appeal from a denial of a motion for judgment notwithstanding the verdict, this Court must consider the evidence in the light most favorable to the non-moving party and disregard evidence presented by the moving party which is in conflict with that presented by the nonmoving party. If the evidence so viewed is sufficient to support the verdict of the jury, the verdict must stand. Gast v. Rogers-Dingus Chevrolet, 585 So.2d 725, 728 (Miss. 1991) (citing Rester v. Morrow, 491 So.2d 204 (Miss. 1986); Black v. Peoples Bank and Trust Company, 437 So.2d 26, 28 (Miss. 1983); Gee v. Hawkins, 402 So.2d 825 (Miss. 1981); Blackwell v. Dairymen, Inc., 369 So.2d 511 (Miss. 1979); Pay Master Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975)).
Turner's argument under this assignment of error depends, as it did below, entirely on Lewis v. Soriano, 374 So.2d 829 (Miss. 1979). There, the defendant, a doctor in a general practice, represented to the plaintiff that he thought he could obtain a good result with a surgical procedure which required the level of training and skill possessed by an orthopedic surgeon. The doctor was unable to obtain a good result and the patient sued. The jury returned a verdict for the defendant, but this Court reversed the denial of the motion for judgment notwithstanding the verdict and remanded for a new trial on the issue of damages only. The Court held that the defendant should be held not to the standard of care of a general practitioner but that of an orthopedic surgeon, since he had undertaken an operation requiring the level of skill and experience of an orthopedic surgeon.
In the case at bar, the appellees did admit that they acted in a sort of dual role as orthopedic surgeons and neurosurgeons. However, simply because they acted in such a dual role does not lead inescapably to the conclusion that they were negligent, as Turner contends. All of the appellee's witnesses testified that a great deal of the work of neurosurgeons and orthopedic surgeons was overlapping, particularly in the area of back surgery. Dr. Vise and Dr. Stringer both testified that had they been present during and after the surgery, they would have done nothing differently from what Dr. Temple and Dr. Gandy did. They saw no breach of the standard of care expected of qualified orthopedic or neurosurgeons. Thus, what the Court is faced with is the classic factual dispute to be settled by the jury. Turner's expert said the doctors were negligent. The doctors and their experts said they were not. Viewing the evidence in the light most favorable to the doctors, it cannot be said that the trial court erred in overruling the motion for judgment notwithstanding the verdict.
The breach of fiduciary duty argument is without merit. Although Dr. Temple did testify that he had a very close *823 relationship with Turner and his wife, Turner does not show the court how he has been harmed by any breach of fiduciary duty which might have occurred by failing to notify Dr. Warren. Again, Turner's expert witness testified that a neurosurgeon should have been present, but the doctors' experts testified to the contrary. Additionally, Turner did not request a jury instruction on breach of fiduciary duty in the lower court. Such failure precludes consideration of the issue by this Court. Cadillac Corporation v. Moore, 320 So.2d 361, 364 (Miss. 1975); Gulf & S.I.R. Co. v. Saucier, 139 Miss. 497, 104 So. 180 (1925).

II. THE LOWER COURT DID NOT ERR IN REFUSING INSTRUCTION P-20 ON ASSUMED RESPONSIBILITY.
Turner once again relies solely on Lewis v. Soriano, supra, in support of his argument that this instruction, which have held the doctors to the standard of care of a neurosurgeon, should have been granted. The appellees argue simply that the instruction would have told the jury to consider their actions under the wrong standard of care and that they should not be held to the standard of a neurosurgeon. The lower court held that the facts of the case did not support the instruction.
To have an instruction granted, the proponent must show that (1) the instruction is supported by the evidence and that (2) the instruction is a correct statement of the law. Copeland v. City of Jackson, 548 So.2d 970, 973 (Miss. 1989); Hill v. Dunaway, 487 So.2d 807 (Miss. 1986); Lewis Grocer Co. v. Williamson, 436 So.2d 1378 (Miss. 1983). However, if the other instructions granted adequately instruct the jury, a party may not complain of the refused instruction on appeal to this Court. Purina Mills, Inc. v. Moak, 575 So.2d 993, 996 (Miss. 1990); Payne v. Rain Forest Nurseries, Inc., 540 So.2d 35, 40 (Miss. 1989).
The lower court granted instruction P-21. This instruction permitted the jury to find the doctors liable more easily than it could have under the refused instruction. Under P-21, the jury did not have to accept Dr. Austin's contention that a neurosurgeon was necessary. They merely had to hold that the doctors breached the standard of care of an orthopedic surgeon in not properly recognizing and treating the neurological complications. Had they believed Turner's contention that a neurosurgeon was needed, the jury reasonably would have held that they breached their duty as orthopedic surgeons. The granted instruction, P-21, even included language concerning failure to obtain a "neurosurgical consult." Therefore, P-21 adequately instructed the jury.

III. THE LOWER COURT DID NOT ERR IN ALLOWING THE QUESTIONS ALLEGEDLY FRAMED AND BASED ON A LOCALITY RULE.
Turner's argument under this issue is that the questions asked on voir dire of Dr. Austin by counsel for the doctors left the jury with the impression that whether the witness was familiar with medical practices in Mississippi had something to do with his reliability, contrary to the national standards used for medical malpractice in Mississippi. The doctors contend that the error, if any, was waived by failure to timely object and that the questions were correct anyway, since the locality rule is not totally abolished in Mississippi.
The appellees are correct in that Turner's counsel allowed five questions that obviously went to the locality rule before an objection was registered. The rule in this state is established that, in order to properly oppose the introduction of evidence contended to be inadmissible, a contemporaneous objection must be made. Miss.R.Evid., R. 103(a)(1); Willie v. State, 585 So.2d 660, 678 (Miss. 1991); Ball v. Sloan, 569 So.2d 1177, 1179 (Miss. 1990); Mills v. Nichols, 467 So.2d 924 (Miss. 1985). Objection to this testimony was waived by the failure to timely object.
However, even if the objection had been timely made, the lower court did not err in allowing such questioning on cross examination. The locality rule was not totally abolished in Hall v. Hilbun, 466 So.2d 856, 873 (Miss. 1985). There the Court stated that where the medical expert lives or *824 practices is not relevant per se. The Court redefined the standard of care as:
[G]iven the circumstances of each patient, each physician has a duty to use his or her knowledge and therewith treat through maximum reasonable medical recovery, each patient, with such reasonable diligence, skill, competence and prudence as are practiced by minimally competent physicians in the same specialty or general field of practice throughout the United States, who have available to them the same general facilities, services, equipment and options.

Id., at 873 (emphasis added).
Additionally, to testify concerning treatment actually given to the patient, Hall further held that the witness "must be familiarized with the facilities, resources, services and options available." 466 So.2d at 875. The Court reiterated this view when, in Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346 (Miss. 1990), the Court affirmed a trial court's decision to disregard a medical expert's affidavit. The Court upheld the trial court's decision, in part, on the basis that the medical "expert" had not familiarized himself with the facilities available to the defendant doctor or in the general area of the state. Id. at 1358.
Applied to this case, the line of questioning at issue is proper. In particular, Dr. Austin could not say whether the equipment which he testified that Dr. Temple and Dr. Gandy should have used was available at River Oaks hospital or in Mississippi. Therefore, the relevance of the line of questioning concerning his knowledge of practice in Mississippi is evident. The lower court did not err here.

IV. THE LOWER COURT DID NOT COMMIT REVERSIBLE ERROR IN GRANTING INSTRUCTIONS D-13, D-14 AND D-15; SUCH INSTRUCTIONS DID NOT AMOUNT TO PEREMPTORY INSTRUCTIONS ON ALL ISSUES.
The Turners fought Instruction D-13 because it purports to address only the issue of negligence; however, they contend that by telling the jury that if it found no negligence it must find for the doctors, the instruction amounted to a peremptory instruction on their other theories of informed consent and assumed responsibility. As to D-14 and D-15, the Turners waived any objection to those instructions by not imposing objections at the instruction conference. Instruction P-5, given at the request of the Turners, informed the jury on the elements of informed consent and stated that if they found Turner did not give his informed consent, the jury could find for him. Further, instruction P-21 informed the jury that they could find in favor of the Turners if the appellees failed to conform to the standard of care for orthopedic surgeon in their pre-operative, operative, or post-operative care of Turner.
The principle is well established that jury instructions are to be considered as a whole to determine whether or not the jury has been correctly instructed. Glorioso v. YMCA of Jackson, 556 So.2d 293, 295 (Miss. 1989) (citing Byrd v. F-S Prestress, Inc., 464 So.2d 63, 66 (Miss. 1985); Jackson v. Griffin, 390 So.2d 287, 290 (Miss. 1980); Allen v. Blanks, 384 So.2d 63, 65 (Miss. 1980)).
We are of the opinion that the jury was properly instructed, reading and considering the instructions as a whole, and that no reversible error was committed by the lower court.
We do note that the attorneys representing parties in court should be more careful in the drafting of instructions, i.e., the language of each instruction on an issue should relate only to that issue, not the general verdict.
There being no reversible error in the trial below, the judgment of the lower court is affirmed.
AFFIRMED.
HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and BANKS, JJ., concur.
DAN M. LEE, P.J., and McRAE, J., not participating.
NOTES
[1] The cauda equina is a bundle of nerves splitting off at the end of the spinal cord which supply feeling and control to the legs, bladder and bowels.