661 So.2d 714 (1995)
Barbara WEST and C.M. West
v.
SANDERS CLINIC FOR WOMEN, P.A., a Mississippi Professional Corporation; C.J. Sanders, M.D., W. Carl Kellum, Jr., M.D., A.S. Kellum, M.D., and C.K. White, M.D.
No. 91-CA-00801-SCT.
Supreme Court of Mississippi.
September 21, 1995.
*716 E. Farish Percy, Grady F. Tollison, Jr., Tollison Austin & Twiford, Oxford; Timmons Randle & Russell, Tupelo; Robert H. Bass, Jackson, for appellant.
L.F. Sams, Jr., John G. Wheeler, Mitchell McNutt Threadgill Smith & Sams, Tupelo; Robert K. Upchurch, Thomas Wicker, Holland Ray & Upchurch, Tupelo, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
McRAE, Justice, for the Court:
This medical negligence case, where a jury returned a verdict in favor of the Defendants, Sanders Clinic for Women and C.J. Sanders, M.D., an obstetrician/gynecologist, W. Carl Kellum, Jr., M.D., a gastroenterologist, and A.S. Kellum, M.D., a general surgeon, is appealed from the Lee County Circuit Court. At issue is whether an expert witness who is a specialist in a particular area of medicine can testify to the standard of care regarding a procedure which could be performed by a general practitioner. Finding that the lower court ruled properly, we affirm the judgment in favor of the defendant physicians. On the cross-appeal, we affirm the circuit court's finding that the Wests' action was not barred by the statute of limitations.

I.
Barbara West alleged that during 1986, the defendants failed properly to diagnose and treat a cancerous mass which was located in her rectum and attached to her vagina. West first complained of chronic pelvic pain to Dr. Sanders on April 22, 1982, who diagnosed her condition as mild endometriosis. She continued to see him from 1982 through 1986, during which time he referred her to various specialists in an attempt to diagnose the source of her pain. Dr. Sanders first referred West to Dr. John Bowlin in January, 1983, who found a mass located on the posterior wall of her rectum. This mass was described by various doctors as being anywhere from three centimeters to the size of a lemon. West also was treated by gastroenterologist Dr. Barney Guyton, recommended by Dr. Sanders, on a number of occasions.
Dr. Carl Kellum discovered a bloody mass in West's rectum and stated he was concerned about colon cancer. He conducted a biopsy in May, 1986 with the results being "[b]enign. No evidence of endometriosis." Not satisfied, Dr. Kellum, along with Dr. A.S. Kellum, performed a flexible sigmoidoscopy, which allowed the physicians to view inside the rectum and retrieve additional samples of the mass. Two other physicians also examined West while she was hospitalized. Once again, no cancer or endometriosis was found. The mass was reported to be a hyperplastic polyp with moderate dysplasia, which Dr. Carl Kellum admitted at trial was a characteristic of a carcinoma. However, he disagreed with the characterization of the mass as a "hyperplastic polyp."
Dr. Sanders performed a total hysterectomy on West on June 20, 1986, ostensibly to treat both the endometriosis and the rectal mass. West stated that she was under the impression from Dr. Sanders that a total hysterectomy was necessary "to get that knot out," and indicated that she would not *717 have wanted the procedure unless it would take care of the rectal mass. Dr. Sanders testified that he did not think he actually told West that the mass was not cancerous, but admitted that he told her, after surgery, that there was no evidence to make him think there was cancer, and that hopefully, the surgery was "definitive therapy for her endometriosis and the condition she had."
West returned to Dr. Sanders in August with stomach pains and continued rectal bleeding. He prescribed Danocrine and told her this would "shrink" the knot in her rectum. She then voluntarily returned to Dr. Carl Kellum in August with the same complaints. Dr. Kellum consulted with Dr. A.S. Kellum, who performed a proctoscopy to biopsy the rectal mass. Dr. Carl Kellum claimed he discussed surgery with West and suggested that she get a second opinion from a major center. The Drs. Kellum did not see West again.
West returned to Dr. Sanders in November, at which time he noted an increase in the size of the mass in her rectum. In January, 1987, he referred West back to Dr. Bowlin, who advised her that there was a possibility that a colostomy was needed. West denied having this discussion with Dr. Bowlin, but stated that he told her that she would have to consult with other colon specialists. West subsequently left the hospital before being discharged.
On February 7, 1987, West went to Dr. William Barnett, a physician in Jackson who was recommended by Dr. Sanders after she asked him who else she might see. Because the tumor persisted after months of benign biopsies, Dr. Barnett immediately admitted her to Baptist Hospital for a colon resection which removed the mass, a colostomy and an additional biopsy on February 9, 1987. That report gave no evidence of endometriosis in the mass, but indicated that the tumor in the mid-rectum adherent to the vagina was cancerous. West then underwent chemotherapy under the direction of Dr. Julian Hill, an oncologist in Tupelo. Dr. Hill determined that she suffered from "Dukes' C rectal carcinoma and had a low anterior resection with diverting colostomy."
At trial, there ensued a battle of the experts. Dr. Neil Wolfson, an expert in obstetrics and gynecology, testified that contrary to Dr. Sanders' actions, he would have excised the mass in the rectum while conducting the hysterectomy. He further stated that a hysterectomy alone was not the treatment for the mass. Dr. Sanders, however, countered that he would not remove a benign lesion.
Dr. Wolfson further testified that the location of the mass on the posterior wall of the rectum, was a "very unusual place" for a mass associated with endometriosis. Furthermore, Dr. Wolfson said he could not find any "hard evidence" from the medical records that West even suffered from endometriosis. He opined that Dr. Sanders' treatment of West fell below the minimally accepted standard of care, and he should have at least had a surgeon present to remove the rectal mass. Dr. Wolfson further felt that Dr. Sanders' treatment fell below the acceptable standard even though he referred West to a specialist, and that he should have referred her to another specialist when Dr. Carl Kellum was unable to successfully treat her.
Dr. Sanders admitted stating in his deposition testimony that he was concerned that his diagnosis of endometriosis, as far as the rectal mass, might have been inaccurate. He observed the mass in May, August, November, and December and did nothing to treat it except refer West to other specialists. The mass continued to grow from August until November, at which time he testified that he told West that if it did not get better in three weeks, he would probably send her to someone else. Although he admitted that early treatment of cancer was important, he opined that one month was not necessarily too long to wait for treatment of someone suspected of having cancer. Dr. Barnett, West's surgeon, testified on behalf of Dr. Sanders and the clinic that immediately after the surgery, holding the tumor in his hand, he still could not determine if it was cancerous, so he sent it to the lab. He further testified that there was no actual invasion of the vagina by the tumor.
Dr. Atilla Ertan, a gastroenterologist from Metairie, Louisiana, ascertained from his review *718 of the records that West's mass ran from the posterior to the anterior part of the rectum. Based upon his experience, training, and teaching, he believed to a reasonable degree of medical certainty that West was suffering from a tumor during the time she was treated by Dr. Kellum. Dr. Jeremiah Henry Holleman, testifying on behalf of the Drs. Kellum, discussed the standard of care for a general surgeon in 1986. He stated that Dr. A.G. Kellum's proctoscopic view of Barbara's rectum using alligator forceps to attempt to diagnose and treat her illness met the acceptable standard of care at that time.
At trial, the main fact question for the jury to decide, therefore, was whether the defendants failed properly and timely to diagnose West's condition and further, whether they breached the standard of care of a minimally competent physician. The jury returned verdicts for all the defendants and judgment against the Wests was entered February 28, 1991. Their motion for a new trial, based on the exclusion of various statements made by their experts and jury instruction issues, was denied on July 31, 1991.

II.
The first assignment of error arises from the trial court's exclusion of testimony by expert witnesses, Drs. H. Grant Taylor and William Stein, who stated that under the standard of care common to all medical doctors, the large rectal tissue growth should have been removed upon discovery and without delay. In addition to his other opinions, the Wests sought to offer Dr. Taylor's deposition to show his opinion as a general practitioner to demonstrate that the defendants had failed to adhere to the standard of care of a general practitioner, not to his specialty, since the procedures used to diagnose West were of a general nature and not limited to a particular area of specialization. The Kellums, who had reserved their right to object to introduction of the testimony at trial before the deposition was taken, asserted that "he can testify about other matters about cancer or treatment of cancer, but we do not think that he is qualified and have preserved that objection to testify as to the standard of care for a gastroenterologist or for a general surgeon." The three areas where Dr. Taylor's deposition was marked out and not read to the jury involved what he would have done as an oncologist, what acceptable medical care was as opposed to the "minimally acceptable" standard, and other testimony characterized as "speculative" in nature. Arguing that Dr. Taylor's testimony was properly excluded under Hall v. Hilbun, 466 So.2d 856 (Miss. 1985), the Kellums assert that Dr. Taylor gave his expert opinion from an oncologist perspective only. For example, questions asked of him are couched in terms of, "[I]n your opinion based upon your experience in oncology... ." and "[F]rom your perspective as an oncologist... ." In one of his responses, Dr. Taylor stated, "I don't deny that I'm not a gastroenterologist, and I don't do rectal biopsies." The trial court judge upheld the doctors' objections to admitting Dr. Taylor's deposition, noting that he was an oncologist and "[h]e enunciates no qualifications regarding the standard of care, his knowledge of that; and while he may speak to what he would do as an oncologist, it's my opinion that he does not meet the Hall v. Hilbun test concerning his qualifications to testify."
Hall v. Hilbun, 466 So.2d 856, 871-72 (Miss. 1985) charges each physician with possessing or having reasonable access to such medical knowledge as is commonly possessed or reasonably available to minimally competent physicians in the same specialty or general field of practice throughout the United States. Since Hall, we have decided Brown v. Mladineo, 504 So.2d 1201 (Miss. 1987), which reversed a trial court decision prohibiting a pathologist and general surgeon from testifying as to the standard of care for gynecological surgery, an area with which he was familiar after serving as chief of surgery at three hospitals. Brown, 504 So.2d at 1202. As we pointed out in that case, "[t]he general rule in medical malpractice actions is that `a specialist in a particular branch within a profession will not be required.'" Id., quoting McCormick, Evidence, § 13, (3d ed. 1984). We further explained:
Most courts allow a doctor to testify if they are satisfied of [sic] his familiarity with the standards of the specialty, though he *719 might not practice the specialty himself. One court explained that "it is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." Fitzmaurice v. Flynn, 167 Conn. 609, 356 A.2d 887, 892 (1975). See also, Cline v. Lund, 31 Cal. App.3d 755, 107 Cal. Rptr. 629, 637-38 (1973) (pathologist may testify as to ob/gyn surgical standards).
Id. As distinguished from Brown, however, the Wests did not establish that as an oncologist, Dr. Taylor was familiar with the standard of care of a gastroenterologist. Therefore, certain parts of Taylor's deposition testimony were properly excluded.
While Dr. Taylor testified in his deposition that he had treated patients with recognized clinical signs of colon carcinoma, he did not intimate that he knew how a gastroenterologist would treat such a patient. However, that part of the deposition which dealt with generalities was admitted. The Wests, therefore, were not prejudiced by the exclusion of the deposition testimony.
In McCarty v. Mladineo, 636 So.2d 377 (Miss. 1994), we explained that a physician "must provide the standard of care provided by minimally competent physicians. If his actions in trying to meet that duty of care are unreasonable, then he must be negligent." Id. at 380. We defined "minimally competent" as describing "the degree of skill and knowledge that a professional must bring to the task." Id. at 381.
A minimally competent physician, lawyer, accountant, etc., is one whose skills and knowledge are sufficient to meet the licensure or certification requirements for the profession or specialty practiced. That person is required to act as a reasonably prudent person with the required knowledge and skill would act in the same circumstances.
Id. In this case, to meet the standard of care, the physician was required to utilize information from an accepted diagnostic procedure. The procedure is one that could be used in a specialized or a generalized practice. The Sanders urge that the standard of care is that which is expected of a general practitioner using the procedure, not of a specialist. Therefore, any licensed practitioner could testify that the defendants violated the standard of care, not as specialists, but as general practitioners. We find no fault with this. As we pointed out in Brown v. Mladineo, "[i]t was not our intent [in Hall v. Hilbun] to adopt a uniquely restrictive standard by holding that only a specialist can testify about the standards of his own specialty." Brown, 504 So.2d at 1203. Likewise, we did not intend to restrict a specialist from offering his opinion as to what standards a general practitioner should adhere to. Their expert witnesses basically were allowed to so testify and therefore, they cannot now complain.
Dr. Sanders further objected to part of the Taylor deposition which dealt with the hysterectomy. In that part of the deposition which was read to the jury, Dr. Taylor testified that he is a physician/internist in the field of oncology and hematology. Thus, the plaintiffs failed to meet the very steps toward acceptance of medical expert opinion testimony they cite under Hardy v. Brantley, 471 So.2d 358 (Miss. 1985), which considers "(1) whether the subject matter of the proffered testimony is of the sort on which expert opinion evidence will assist the finder of fact; (2) whether the area of expertise is scientifically established so that valid opinion may be produced within that area; and, (3) finally, whether the witness is qualified." Id. at 366. Since Dr. Taylor was associated with a university medical facility, the Drs. Kellum raised a general objection to that part of his testimony which dealt with his familiarity with the resources available at the North Mississippi Medical Center in Tupelo. However, under Hardy, the "resources" factor is not controlling in order for expert testimony to be received. Hardy, 471 So.2d at 367. Nevertheless, despite the exclusion of portions of Dr. Taylor's testimony, the Wests were still able to present significant proof to the jury regarding the diagnosis of endometriosis and the treatment of the rectal mass.
Virtually the same arguments made against the admission of Dr. Taylor's testimony were raised against that of Dr. William Stein, an internist and oncologist from Metairie, Louisiana. He admitted that he was *720 not familiar with the standard of care for a gynecologist.
The trial court sustained the objection to the following question raised by West:
Q: Doctor, I want to ask you this question first in this way. Do you have an opinion to a reasonable degree of medical certainty as to whether a doctor, not just a specialist, just a doctor with a license from medical school, using that standard, based on you being a doctor with a license from your medical school, not your specialty area, do you have an opinion as to whether or not the minimal standard of care that Barbara West had a right to expect from a doctor in Tupelo, Mississippi, in April, May, 1986, whether she received a minimum standard of care in the treatment of this mass in her rectum?
The Wests asserted that if a general medical practitioner would remove the mass, then the defendant doctors, as specialists, likewise should have because they all had, at the very least, basic medical degrees.
Drs. Carl and A.S. Kellum made oral and written objections to Dr. Taylor's deposition testimony asserting that he was not qualified to testify because he was not familiar with the applicable standard of care. Dr. Taylor admitted that he did not regularly perform endoscopic examinations akin to that performed on West by the Drs. Kellum. Again, the Wests seek to offer his opinion as to what a general medical physician would do under these circumstances. They further argue that Dr. Taylor was going to testify that the deterioration of West's condition which resulted from the delay in treatment was applicable to causation, not to the standard of care. However, while the standard of care involved a medical procedure and what a general medical physician would have done under like circumstances, the physician's experts were allowed to present their opinions. A specialist may testify as to the standard of care that a general medical practitioner should follow when performing a recognized medical procedure. Much of Dr. Taylor's testimony concerning what a general practitioner would do under these circumstances was introduced into evidence through his deposition. Because other expert testimony was offered regarding the standard of care for a gastroenterologist/internist and Dr. Taylor's testimony therefore would have been cumulative, we find no error in the exclusion of parts of the deposition. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected... ." M.R.E. 103(a).
We find no merit, however, in the contention that parts of Taylor's deposition was speculative because he testified in language couched in terms of possibilities, and not probabilities. This Court does not require magical language in an expert's answers, as long as the import of the testimony is apparent. Kelley v. Frederic, 573 So.2d 1385, 1389 (Miss. 1990).
The Wests further urge that Dr. Carl Kellum, Jr. and Dr. A.S. Kellum should have been held to the standard of care of an oncologist because they undertook to treat West's cancer. Dr. Stein, as a board certified internist, opined that employing the minimal standard of care, the rectal mass should have been removed as early as April, 1986. We reiterate that a physician may be held to the standard of care of another specialty other than his own, if the physician assumes the duties of the specialty. Lewis v. Soriano, 374 So.2d 829, 831 (Miss. 1979). When a doctor makes an unqualified recommendation of referral to another specialist, but the patient refuses to follow the referral, then the patient cannot complain later of the doctor's lack of skill and may only complain if the doctor negligently performs treatment. Id. As we further explained in Turner v. Temple, 602 So.2d 817 (Miss. 1992), a physician's assumption of the dual roles of orthopedic surgeon and neurologist did not render him negligent. Id. at 822. Likewise, while the Drs. Kellum may have provided a course of treatment that overlapped with what a oncologist would do, the treatment was not per se negligent. There is no merit to this assignment of error.
It is within the sound discretion of the trial court to determine whether a proffered expert is qualified to testify and that decision will be reversed on appeal only *721 where there has been an abuse of discretion. Seal v. Miller, 605 So.2d 240 (Miss. 1992); Hollingsworth v. Bovaird Supply Co., 465 So.2d 311, 315 (Miss. 1985). Because we find that the testimony of the various witnesses was properly excluded, we find no abuse of discretion.

III.
The Wests further contend that the trial court erred in refusing to grant Instruction P-19, which would have instructed the jury about Dr. Sanders' alleged deviation from the minimum standard of care in performing a hysterectomy on Barbara West. We find, however, that the Wests failed to give adequate responses to discovery questions such that Dr. Sanders would understand that an attack on the propriety of performing the hysterectomy was part of the claim against him.
At trial, Dr. Sanders asserted that he was prejudiced by the Wests' attempt to enter Dr. Wolfson's expert testimony on the propriety of the hysterectomy because no such defense was raised nor was it offered it in their answer to interrogatories. The trial court ruled that according to M.R.C.P. 26(f)(2), a party plaintiff, having answered specific interrogatories designed to discover the exact cause or causes stated for relief, is required to supplement any additional or other alleged causes, as in this case, inappropriate treatment. As the Rule has been explained,
MRCP Rule 26(f)(2) states that "[a] party is under a duty to seasonably to amend a prior response if he obtains information" which renders the initial response inadequate or where "a failure to amend the response is in substance a knowing concealment." "Seasonably" does not mean several months later. It means immediately.
Nichols v. Tubb, 609 So.2d 377, 389 (Miss. 1992) (McRae, dissenting). Nowhere in the West's responses is there any indication that an expert witness would testify that the hysterectomy had been unnecessary. Thus, by not allowing the expert testimony, the issue was not in evidence and the jury could not be so instructed. Turner v. Temple, 602 So.2d 817, 823 (Miss. 1992).

IV.
The Wests further argue that the trial court erred in its instructions to the jury regarding the liability of Sanders Clinic for Women for the acts of its agents. Dr. Sanders was a partner in the Sanders Clinic. Thus, he was "an agent of the partnership and therefore binds the partnership if acting within the usual scope of the partnership." Duggins v. Guardianship of Washington, 632 So.2d 420, 427 (Miss. 1993); Miss. Code Ann. § 79-12-17(1) (1972). Over the West's objections, the jury was instructed:
"You are instructed that the liability of Sanders Clinic for Women, P.A. if any, does not exceed and is in fact the same as any liability of Dr. C.J. Sanders."
"To be entitled to a jury instruction, the proponent must show that the proposed jury instruction is supported by the evidence and the instruction is the correct statement of the law." Turner v. Temple, 602 So.2d 817, 823 (Miss. 1992); Copeland v. City of Jackson, 548 So.2d 970, 973 (Miss. 1989). The Wests assert that the instruction, as given, was an incorrect statement of the law, suggesting that an employer may be vicariously liable for its employee's actions even when the employee is held not liable. Meena v. Wilburn, 603 So.2d 866, 873 n. 11 (Miss. 1992). However, Sanders and Sanders Clinic were the same entity. Any "loss or injury caused by an individual partner acting within the scope of the partnership is imputed to the partnership." Duggins, 632 So.2d at 427. If Sanders were found liable, then, the Clinic would also be liable. Conversely, under the circumstances of this case, where no liability was found on the part of the physician, there can be no liability imputed to the partnership. Accordingly, this issue is without merit.

CROSS-APPEAL
On cross-appeal, the doctors assert that the trial judge erred in reversing his prior summary judgment which found that the Wests had failed to timely file their lawsuit. The complaint alleging medical negligence *722 against Dr. Sanders, his clinic, and the Drs. Kellum was filed on February 10, 1989. On March 24, 1989, the Wests filed an amended complaint joining additional defendant doctors, Dr. C.K. White and Dr. Joe N. Bailey, III,[1] at which time process was issued for the first time on all of the named defendants.
Claiming that West knew she had a cancerous tumor as of February 9, 1987, and process was not issued until March 24, 1989, the doctors filed motions for summary judgments in June, 1989, asserting that the suit was barred by Miss. Code Ann. § 15-1-36 (1972), the two-year statute of limitations for medical malpractice actions. The Wests countered that they did not know they had an actionable claim until sometime in the fall of 1987, further asserting that it was not necessary to issue process in order for a lawsuit to be considered legally filed. The circuit court judge originally sustained the defendants' motion for summary judgment on September 29, 1989, vacating that decision on October 24, 1989.
Pursuant to our decisions in Erby v. Cox, 654 So.2d 503 (Miss. 1995) and In Re Estate of McClerkin v. Martell, et. al., 651 So.2d 1052 (Miss. 1995), the trial court correctly found the case not time-barred because West did not wait an inordinate length of time to bring her claim, but rather, made a good faith effort to ascertain whether she had a claim and issued and served process only one month later, well within the 120 day limit as permitted by MRCP 4(h). See also Estate of Schneider, 585 So.2d 1275, 1277 (Miss. 1991) (overruling In re Estate of Stanback, 222 So.2d 660 (Miss. 1969)), a pre-Rules decision finding that mere filing of complaint did not toll statute of limitations).

CONCLUSION
In summary, the Wests presented four medical experts against Drs. Sanders, Carl Kellum and A.G. Kellum. While minimal portions of the testimony from expert witnesses Drs. Taylor and Stein were excluded, the doctors were substantially able to testify as to their opinions regarding what a general practitioner would do under similar circumstances. This was simply a battle of the experts wherein the jury found against the Wests. Secondly, the propriety of performing a hysterectomy was not properly presented in discovery as a theory of the plaintiffs' case, and therefore, since it was not in evidence, was properly excluded from the jury instructions. Finally, there is no merit to the Wests' contention that the Sanders Clinic should be vicariously liable for Dr. Sanders actions when, he, individually, was not found liable. Accordingly, we affirm on all issues.
ON DIRECT APPEAL JUDGMENT IS AFFIRMED.
ON CROSS-APPEAL JUDGMENT IS AFFIRMED.
HAWKINS, C.J., and DAN M. LEE and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
NOTES
[1] The complaints against Drs. Bailey and White were later dismissed with prejudice.