LEE *v.* STATE

No. 39871      December 19, 1955      83 So. 2d 818

*Prewitt & Bullard,* Vicksburg, for appellant.

*J. R. Griffin,* Asst. Atty. Gen., Jackson, for appellee.

GILLESPIE, J.

Appellant was indicted, tried and convicted of an assault with intent to kill and murder. The indictment charged that the appellant "... an assault did make in and upon the body of one Jack Lee Kizziah, Jr., with his hands, and did then and there take hold of and choke him, the said Jack Lee Kezziah, Jr., with means and force likely and sufficient to produce death."

The court reporter died before his notes were transcribed and the testimony is before this Court in the form of a special bill of exceptions. On March 6, 1955, appellant was living with his wife and two children, one child being about a year old and the other a child about two months old. They lived in Vicksburg. The wife's family came for a visit, a family fight followed, and the wife took the smallest baby and went with her father to Issaquena County. Jack Lee Kizziah, Jr., was left with his father. On March 10, 1955, in response to a message sent by the appellant to his wife, the wife returned to Vicksburg, accompanied by her father and brother. They first went to the county prosecuting attorney's office, and then to the home of appellant's

parents, where they secured custody of Jack Lee Kizziah, Jr., and returned to the prosecuting attorney's office after leaving a message for the appellant to meet them there. The appellant met them at the county attorney's office, and after a conference, all went down the steps of the courthouse in Vicksburg to the ground floor lobby. No reconciliation had been reached and the appellant's wife had Jack Lee Kizziah, Jr., in her arms. When they reached the foot of the stairs, appellant grabbed hold of the child, who was in his mother's arms, and said, "give me the baby, I'll kill him," whereupon appellant took hold of the child either about the head, neck or body. His wife screamed, his father-in-law and brother-in-law were pulling and beating on appellant while he was holding on to the child. They scuffled about the lobby of the courthouse into the chancery clerk's office for a period of some three to five minutes. Appellant had in his hand an unopened pen knife, but there is no proof that he made any attempt to use this knife as a weapon. The sheriff and two of his deputies heard the commotion, went from the sheriff's office to the chancery clerk's office, and forceably subdued appellant and took him to jail. On the way to the jail, appellant said: "I know if I kill my baby they would kill me, but I would rather be dead with him than for her to have him. If I had a gun I would kill the whole bunch now."

At the termination of the fight, the baby was crying, had a bruise on his forehead, a scratch on his back, and bruises on the cheek and nose. It appears that the child was not seriously injured and was not carried to the doctor until the following day. The sheriff and his deputies testified that they had to pry the appellant loose from his baby. Appellant's version was that he was only trying to get possession of his baby, that he had no intention of harming the child, but only wanted to keep his wife from taking the child away from him.

Appellant assigns as error the refusal of the lower court to admit testimony of another cause of

marks and bruises on the child after the state had introduced evidence that the marks of violence were the result of the assault on the child. Testimony was offered by appellant that the child received bruises from a fall from a bicycle two days previous to the alleged crime. Objection was sustained to this evidence. Such evidence would tend to bolster appellant's version that he did not use excessive force in trying to take the child from his wife and that he did not intend to harm his child; likewise, such testimony would tend to impeach the state's witnesses as to the injuries inflicted on the child by appellant. We hold that this evidence should have been admitted.

■■ Appellant contends that he should not have been convicted of assault with intent to kill and murder under the proof in this case. It is true that appellant said, "give me the baby, I'll kill it," and later made statements consistent with an intent to kill. Of course, such threats and statements are admissible on the question of intent, but the means and force actually used are the principal factors on the question of intent. The State does not contend that appellant tried to use the pen knife as a weapon. A baby could easily be killed with the hands, either by striking it or choking it. The means were sufficient to produce death, but the force used was not sufficient to produce death or great bodily harm. Appellant had hold of the child while the parties involved scuffled across the courthouse lobby into the Chancery clerk's office, for a period of three to five minutes. The child was crying when it was over. The charge was that the intent, design and attempt was to choke the child to death, but the only injuries were bruises on the forehead, cheek, and nose, and a scratch on the neck, and none of these injuries were shown to be serious.

■■ The child was not taken to a doctor until the next day and whether this was for treatment or examination was not shown. If the State's witnesses were cor-

rect in stating that appellant had hold of the child during the time the scuffle took place, the appellant could easily have killed or at least seriously injured the child. We think the facts clearly show that appellant was not trying to kill the baby. An intent to kill and murder is the gist of the offense of assault and battery with intent to kill and murder; and where it appears that the accused had available the means to produce death and the opportunity to use such means, but failed to make use thereof in a manner likely to produce death or great bodily harm, such circumstances negative an intent to kill and murder. Accordingly, we hold that the facts do not justify a conviction of assault and battery with intent to kill and murder. Cf. Griffin v. State, 196 Miss. 528, 18 So. 2d 437, and Daniels v. State, 196 Miss. 328, 17 So. 2d 793.

Appellant assigns as error the action of the lower court in leaving the jury under the care of the sheriff and his deputies, who were material State witnesses.

The sheriff and two of his deputies, Smith and Wicker, were eye witnesses to the alleged crime. Each of them was a vital State witness at the trial. Smith and another were sworn in as jury bailiffs. On the second day of the trial, appellant made a motion for a mistrial on the ground that the jury had been in charge of a material witness. Proof was taken on the motion. It was shown without contradiction that deputy Wicker had testified for the State the previous day; that he assisted the jury in various ways, running errands, taking messages, and was in contact with the jury from adjournment of court the day previous until 11 o'clock P.M. that night; that he had not discussed the case with the jury, but engaged in extensive pleasantries and conversation with them. This motion for a mistrial was overruled.

After the verdict, a motion for a new trial was made and oral proof taken thereon. The sheriff was in attendance upon the jury as bailiff, took meals with them,

conversed with them, listened to their jokes, and was in close association with the jury during the trial, after the motion for mistrial was overruled and up to the time the jury retired to deliberate their verdict. He did not discuss any feature of the case with the jury. Also in attendance upon the jury were deputies Smith and Wicker and bailiff McKay. Wicker continued his activities as jury bailiff after the motion for a mistrial was overruled, took meals with the jury, conversed with them, performed errands for the jurors, and these activities continued until the jury retired to consider its verdict. Neither the sheriff, nor the deputies, discussed the case with the jury, and none of them heard the jury discuss the case. The motion for a new trial was overruled.

In Tarkington v. State, 72 Miss. 731, the case was reversed because two deputy sheriffs, who were material witnesses, remained with the jury during deliberations. That case is not in point, but the following language therefrom stresses the importance of the matter under consideration. The Court said: "This ground for reversal is not technical. It is vital, and of universal interest. It affects not only the prisoner, but the whole body of the people, for it touches the confidence of the public in the purity and impartiality of the trial by jury."

In the case of Cook v. State, 38 So. 113, the case was reversed on other grounds but the Court stated as follows: "This record discloses that the witness Young, who was also the father-in-law of the deceased, Crawford, was sitting with the jury around the stove, though in the courtroom where the clerk and some court officers were, and was in conversation with some of them, and complimented one of the jurors, and struck him familiarly on the leg. We refer to this simply to condemn it, and to deduce the great importance of keeping jurors absolutely segregated; *and we are not sure but that we would reverse this case and order another trial for this*

*only, if it were the only error to be found in the record.''*
(Emphasis added)

In Hamburg v. State, 203 Miss. 565, 35 So. 2d 324, the facts were similar to those in the case at bar, except that the appellant's attorney knew that one of the State witnesses was the bailiff attending the jury throughout the trial and waited until a verdict was brought in before making objections. In that case, it was held that appellant did not comply with the rule laid down in Hilbun v. State, 167 Miss. 725, 148 So. 365.

In Hamburg v. State, supra, decided in 1948, this Court disapproved the use of State witnesses as jury bailiffs, using this language: ''In this connection we point out that it would be wiser for courts to avoid the development of such a situation as bailiff to jury testifying in the case.''

The rule announced in Hilbun v. State, supra, and applied in Hamburg v. State, supra, is not applicable here. During the trial, appellant made a motion for a mistrial on the very ground complained of in his motion for a new trial. He did all that he could do to prevent the state's witnesses from continuing in charge of the jury.

■■■ It is clear that the sheriff and his deputies did not consciously attempt to influence the jurors in deciding the case, but that does not determine the question here involved. We are of the opinion that a material witness should not serve as jury bailiff, and if such witness serves as jury bailiff after objection thereto by appellant, it is reversible error.

■■■ It is a common trait of human nature for witnesses to favor the side of the case on which they testify, and many witnesses become partisans for what they regard as their side of the case. Probably one reason for this is that the witness wants the jury to vindicate his version of the facts. A material witness is partisan, or likely to be; and there are many ways a jury could

be influenced without the witness actually discussing the case. Morover, there is opportunity for actual and intended improper influence which can, and should, be avoided.

Of equal or greater importance in this regard is the appearance of unfairness, and this is of vital importance; for public confidence in the fairness of jury trials is essential to the existence of our legal system. Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions. There is no reason why a material witness should serve as jury bailiff and the use of the State witnesses as such was reversible error, where timely objection was made thereto, as was done in this case.

■■ ■ The assignment of error in reference to the admission of evidence is found to be without merit. The case is remanded for retrial for assault and battery.

Reversed and remanded.

*McGehee*, C.J., and *Hall, Kyle* and *Arrington*, JJ., concur.