468 So.2d 87 (1985)
GREAT AMERICAN SURPLUS LINES INS. CO. and Michael George Miller
v.
Wilmer DAWSON.
No. 54697.
Supreme Court of Mississippi.
May 8, 1985.
*88 James L. Carroll, Richard T. Lawrence, Watkins & Eager, Jackson, for appellant.
Michael S. Allred, Thomas L. Kirkland, Jr., Satterfield & Allred, Jackson, MS, Donald E. Walsh, Watson, Wilkerson & Walsh, Liberty, for appellee.
Before PATTERSON, C.J., and DAN M. LEE and SULLIVAN, JJ.
PATTERSON, Chief Justice, for the Court:
This appeal follows a judgment in the Circuit Court of Amite County in the aggregate amount of $550,000.00 in favor of the plaintiff/appellee Wilmer Dawson. We reverse and remand for a new trial.
In our opinion the trial court improperly overruled defendants' motion for mistrial before any testimony was heard by the jury. Therefore we recount only those facts necessary for disposition on that ground.
On January 3, 1979, Great American Surplus Lines Insurance Co. (Great American) and Lloyds, London (Lloyds) each issued to Wilmer Dawson a policy of insurance covering three pieces of logging equipment as follows: one (1) 1977 Viking loader in the amount of $10,500 each policy; one (1) 1974 Taylor skidder in the amount of $7,500.00 each policy; and one (1) 1975 Timer Jack skidder in the amount of $7,500 each policy. Thus Great American and Lloyds had each insured the equipment for $25,500.00, bringing the total amount of insurance issued on the property to $51,000.00. Both policies were brokered by a local agent in Gloster, Mississippi, through Dupuy-Busching, an agent of both Great American and Lloyds.
On June 22, 1979, a fire destroyed all three pieces of logging equipment. The insurance companies denied Dawson's claim for the loss on the ground Dawson's violation of a warranty provision had voided the policies.
Dawson filed suit on October 9, 1981, in the Circuit Court of Amite County against Great American; Michael George Miller, individually and as representative of certain of the underwriters at Lloyds, London; and Dupuy-Busching General Agency, Inc. The declaration alleged in part that Great American and Lloyds had in bad faith failed to pay the claim. Dawson prayed for contractual damages in the amount of $25,500.00 plus interest from the date of the claim under each policy; consequential damages in the amount of $250,000.00; and punitive damages in the amount of $1,000,000.00.
Great American and Lloyds answered and pled affirmatively that Dawson had violated the policies' warranty provision that "all equipment shall be parked when discontinuing work with at least 25 feet separating each piece of insured equipment" and that Dawson was therefore not entitled to recover under the insurance contract.
The case proceeded to trial in June 1982. After the jury was voir dired, selected, and sworn to try the case, defense counsel Richard Lawrence conducted the following examination of a witness scheduled to testify for the defense:
[OUT OF PRESENCE OF JURY]
Q. Mr. Hess, would you state your name?
A. Odis R. Hess, H-E-S-S, Jr.
Q. And what position do you have with Great American Insurance Company?
A. I'm with the Claims Department.
Q. And while the jury was being selected in this case, would you tell us what you saw as relates to potential witnesses in the case, Dickie Ivy and Roger Dawson?
A. I don't know who the two gentlemen are, but it wasn't during the selection *89 of the jury; it was while you all were in here. In fact it was moments before His Honor and Counsel emerged from this room we're sitting in, which is the juryroom. And the two witnesses were sitting there conversing and joking and carrying on; Wilmer Dawson was part of it, and all the jurors were seated waiting to be called back to the box; some were in the box. And of course all just were listening to this rather folksy and joking conversation which seemed to violate the instructions to have the parties, Counsel, and jury avoid that type of personal contact, and it was  It would have been, put it this way, at home gross misconduct in terms of violating the instructions. Now, down here, maybe that is not the case, but in both State and Federal Court at home, such conduct is considered reprehensible and will not be tolerated.
Q. What, if any, prejudicial effect do you think this might have on your company?
A. I think it ingratiates unnecessarily the Plaintiff to the jury without the opposing parties having the same opportunity to prove that they are decent, human people too, and it gives a personal flavor, which of course, always has an end  it's hard to determine what, if any, effect that personal contact has; but it has more of an effect on the jury than the failure of any contact with the opposing side who is deliberately stepping aside and walking away. When we see a juror coming up, we turn our backs and walk away, which makes you look like a rather cold, impersonal, heartless sole [sic] as opposed to their being the good old folks, and the whole community is just in there sort of pulling for one of the home town people, which quite obviously we aren't; I mean you can sit here and listen to my accent and tell that. [Emphasis added.]
After concluding the examination Attorney Lawrence stated the following:
Your Honor, we would like for the record to show, and I think the other side will stipulate to it, the two witnesses, are Jack Cobb and Dickie Ivy, two witnesses that are going to testify in favor of the Plaintiff's case, and they are very material witnesses; and whether or not their testimony would be believed in the case would definitely have an influence. And I think by them getting up in front of the jury and parading in front of the jury would have a definite adverse effect on our client, and we would move for a mistrial at this time based on what Mr. Hess has said. [Emphasis added.]
The court then allowed plaintiff's attorney Michael Allred to question Mr. Hess, and this colloquy transpired:
BY MR. ALLRED:
Q. Mr. Hess, were these folks ... talking about this lawsuit?
A. I was not able to hear the first part ... and the only part I got was that one in the brown shirt with the scar, whichever one he is ... said, "Well, we'll just give Wilmer here  some comment about money  and then we'll get Wilmer here to be our co-pilot." ...
Q. All right, sir. Did they talk to the jury?
A. The jury was completely surrounding them; they were on the aisle and the first two seats front row, and the jury was in a cluster around them. And to a person, there was not a juror, not looking at them.

Q. Did they speak to each other, sir, or the jury?
A. Well, the one in the brown shirt ... looked over and as he was saying it, he had his head turned, and he was facing, there was no one in that group that he was facing across the aisle except jurors. I have no idea who he was directing it to because I'm looking at him from a different angle. There was a gentleman in a khaki suit ... that was sitting on the rail that was partially blocking the view ...
Q. You can't state under your oath that any of these three gentlemen directed *90 any remarks to the jurors by name ... can you, sir?...
A. I did not hear them direct  did not hear a name of a juror mentioned. However, he was looking right into the faces of several jurors, and they were, of course, talking money; and the only surmise  I think we can all decide what that might have been all about, but I don't know.
Q. Could have been about having lunch; couldn't it?
A. Being a co-pilot, no, I don't think so.

Q. The jurors didn't talk back to them; did they?
A. They were laughing back ... [Emphasis added.]
The parties stipulated the two men conversing with Dawson were Keith Foster, the agent who sold him the insurance policies; and Richard Ivy, a logging inspector; both of whom were to testify for the plaintiff. Defense counsel then stated, "[W]e would also like for the record to show that the court instructed the jury before we went in here and selected the jury not to talk to any of the potential witnesses or parties to the suit, and that's in direct disobedience to the court's instructions."
The court overruled the defendant's motion for mistrial stating in part,
I understand Mr. Hess' feelings, but in these rural counties that we have in Mississippi where the people know each other and there is an air of informality in our courtrooms which we cannot escape ... it's impractical and impossible for us to have a court system which operates the way that it's done in other areas. I have visited courts in larger cities; for instance in Philadelphia, they have two jury bailiffs, the jurors all wear badges; they have separate rooms for the jurors to go to ... and we simply don't have those facilities and this all took place in the open courtroom in front of everyone, and I'm just going to have to overule the motion. You can make your record and let the Supreme Court decide.
We are of the opinion this ruling was error. Our decision is based on the long honored principle that "Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions." Lee v. State, 226 Miss. 276, 286, 83 So.2d 818, 821 (1955). In that case the sheriff, a material witness for the state, served as jury bailiff, assisted by two of his deputies who were also state's witnesses. On the second day of trial the court overruled defendant's motion for a mistrial on the ground the jury had been in the charge of a material witness. Although there was no proof the sheriff and his deputies attempted to exert any influence on the jury, this Court held that fact was not dispositive, stating,
Of equal or greater importance in this regard is the appearance of unfairness, and this is of vital importance; for public confidence in the fairness of jury trials is essential to the existence of our legal system... . There is no reason why a material witness should serve as jury bailiff and the use of State witnesses as such was reversible error, where timely objection was made thereto, as was done in this case.
226 Miss. at 286, 83 So.2d at 821.
Following Lee, Smith v. State, 251 Miss. 241, 169 So.2d 451 (1964), held it was reversible error for deputy sheriffs to serve as bailiffs after having assisted in jury selection. The reasoning of the case was not that the officers committed any actual wrong, but that they must "avoid a situation that might weaken the confidence of the public in our courts and juries ..." 251 Miss. at 247, 169 So.2d at 853-54.
In Perkins v. State, 244 So.2d 414 (Miss. 1971), we reversed a conviction on the ground that a deputy sheriff "was observed conversing with a juror shortly after he had testified as a witness for the State." 244 So.2d at 415.
The scope of these cases was broadened in Dunn v. State, 264 So.2d 823 (Miss. 1972). In that case the sheriff, who was to be a key witness for the state, was not designated as bailiff and was not observed *91 conversing with jurors. He did, however, spend the night at the hotel where the jury was quartered. Quoting extensively from the Lee case, we held this constituted reversible error.
We acknowledge the cases cited above involve criminal prosecutions, and that the rules there announced might apply less strictly in a civil case. For example, in Atwood v. Lever, 274 So.2d 146 (Miss. 1973), the testimony of the plaintiff revealed that "one of the jurors, whose name she did not know, walked up to her, looked at her and said, `You are getting better looking all the time.' To which she replied, `Thank you,' and turned and walked away." 274 So.2d at 147. Defendant's motion for a mistrial was overruled. This Court held,
It is apparent from the evidence that this was a casual complimentary remark made to the appellee by one of the jurors ... Nothing was said concerning the issues in the case. Under these circumstances, the trial court did not abuse its discretion in refusing to grant a mistrial. A mistrial or a new trial should not be granted on this ground in a civil case, unless the circumstances indicate some prejudice, wrongful intent, or unfairness. [Emphasis added.]
274 So.2d at 147.
We are of the opinion the facts of this case distinguish it from Atwood and require us to apply the reasoning of the criminal cases cited above. Obviously, we think confidence in our system of jurisprudence is essential whether the case be criminal or civil, but since a different standard could be urged under Atwood, we need emphasize that it is distinguishable by its vastly different facts. Moreover, this case is legally different in that it is not the usual civil case, as it sought to punish by way of an award of punitive damages.
As revealed by the excerpts from the record quoted earlier in this opinion, the conduct of the plaintiff and two of his material witnesses in the presence of the jury indicates there was at the very least a strong appearance of unfairness if not actual prejudice. Besides having the potential of fostering bias in the jury, such behavior trivializes a serious matter: the disposition of a lawsuit. A lawsuit may be joked about in many places, but not in the courtroom in the presence of those who have been voir dired and sworn to decide the case.
Further, the outcome of a proceeding in the Circuit Court of Amite County, Mississippi, can be just as important, in terms of the effect on people's lives and pocketbooks, as one in Philadelphia or any other large city. Fraternizing of parties and their witnesses with or in the presence of jurors can and should be prevented without special facilities. When such conduct occurs, it should not be condoned.
We are of the opinion the trial court improperly overruled the defendants' timely motion for mistrial. The case is reversed and remanded for a new trial.
REVERSED AND REMANDED.
WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.