# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-CA-01885-COA

**SAMUEL ADKINS, INDIVIDUALLY AND ON BEHALF OF THE STATUTORY WRONGFUL DEATH BENEFICIARIES OF LINDA KAY ADKINS, DECEASED**                                                 **APPELLANT**

**v.**

**CURREN J. SANDERS, M.D. AND SANDERS CLINIC FOR WOMEN, P.A.**      **APPELLEES**

| | |
|---|---|
| DATE OF TRIAL COURT JUDGMENT: | 09/26/2000 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER III |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BO RUSSELL |
| | RICHARD MASSIE MARTIN JR. |
| ATTORNEY FOR APPELLEES: | DONNA M. BARNES |
| | L. F. SAMS JR. |
| | JOHN G. WHEELER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| TRIAL COURT DISPOSITION: | JURY VERDICT FOR DEFENDANTS |
| DISPOSITION: | REVERSED AND REMANDED - 03/19/2002 |
| MOTION FOR REHEARING FILED: | 4/2/2002; denied 5/21/2002 |
| CERTIORARI FILED: | 6/4/2002; granted 8/29/2002 |
| MANDATE ISSUED: | |

BEFORE SOUTHWICK, P.J., LEE, AND CHANDLER, JJ.

CHANDLER, J., FOR THE COURT:

¶1. Samuel Adkins, individually and on behalf of statutory wrongful death beneficiaries of Linda Kay Adkins, deceased, brought this wrongful death action against Dr. Curren J. Sanders, M.D. and the Sanders Clinic for Women. On September 18, 2000, the case was tried before a jury in Lee County, Mississippi. The jury found for the defendants. Feeling aggrieved, Adkins filed this appeal and maintains three allegations of error. First, he argues that the trial judge improperly reconsidered the defendants's motion in limine. Next, he argues that the trial court's refusal to grant plaintiffs's jury instruction concerning a heightened standard of care was error. Finally, Adkins argues that the trial court improperly failed to excuse for cause a juror who was a patient of Dr. Sanders.

¶2. Finding Adkins's assertions persuasive, we reverse as to issues two and three and remand for a new trial.

## FACTS

¶3. Linda Kay Adkins (Kay) died on April 7, 1994, seven days after delivering her first child. Kay was admitted to the North Mississippi Medical Center on March 31, 1994. Although the baby was not due for two more weeks, Dr. Sanders decided to admit Kay early and perform a caesarian section to deliver the baby. Dr. Sanders made this decision based upon Kay's history as a lupus patient.

¶4. Kay began showing signs of complications the day after her delivery. She suffered from several problems, including, fever, significant drops in body temperature, aches and body pains, and decreased urinary functions. Most of these problems were diagnosed as the usual effects of a caesarian birth and were treated as such. However, due to Kay's prior medical history, the complications escalated to the point of becoming fatal and she died on April 7, 1994. Adkins filed this suit alleging that Kay's death was caused by Dr. Sanders's failure to properly treat and care for Kay.

## LAW AND ANALYSIS

### I. DID THE TRIAL COURT ERR IN RECONSIDERING THE DEFENDANTS'S MOTION IN LIMINE?

¶5. Adkins first argues that the trial court erred in reconsidering the defendants's motion in limine. On December 10, 1999, the defendants filed a motion in limine to exclude mention of Dr. Sanders's failure to obtain board certification and prior malpractice suits filed against him. This motion was denied by Judge Ford on June 26, 2000. Subsequent to this ruling, Judge Ford retired from the bench and on September 18, 2000, the case was reassigned to Judge Thomas Gardner, III. On September 15, 2000, the defendants moved for reconsideration of Judge Ford's adverse ruling on their motion in limine. Judge Gardner heard the motion on September 18, and ruled for the defendants, excluding mention of Dr. Sanders's failure to obtain board certification and any prior malpractice suits filed against him.

¶6. Adkins argues that this ruling was error pursuant to the law of the case doctrine. The law of the case doctrine, as recognized by this Court, is as follows:

> The doctrine of the law of the case is similar to that of former adjudication, relates entirely to questions of law, and is confined in its operation to subsequent proceedings in the case. Whatever is once established as the controlling legal rule of decision, between the same parties in the same case, continues to be the law of the case, so long as there is a similarity of facts.

*TGX Intrastate Pipeline Co. v. Grossnickle*, 716 So. 2d 991 (¶97) (Miss. 1997). In *Continental Turpentine and Rosin Co. v. Gulf Naval Stores Co.*, 142 So. 2d 200, 206-07 (Miss. 1962), the court stated, "The doctrine of 'law of the case' is a rule of practice adopted by the courts and rests upon principles of res judicata."

¶7. Because of the res judicata factor, this doctrine is not applicable to the case *sub judice*. The motion in limine did not have the effect of res judicata. The motion was properly reconsidered by Judge Gardner.

### II. DID THE TRIAL COURT ERR IN REFUSING TO GRANT PLAINTIFF'S JURY

**INSTRUCTION HOLDING DR. SANDERS TO A HEIGHTENED STANDARD OF CARE?**

¶8. Adkins argues that the trial court erred in refusing to grant plaintiff's jury instruction P-21 which instructed the jury to hold Dr. Sanders to the standard of care of a rheumatologist. The language for the instruction was taken directly from *Lewis v. Soriano*, 374 So. 2d 829, 831 (Miss. 1979). The requested instruction reads as follows:

> When a defendant tells a patient he can achieve a good result thereby claiming he possesses the skill necessary to perform the medical care involved, the standard of care to be applied in this case is that of an rheumatologist rather than a physician having a specialty in obstetrics. Where a defendant admits that he did not possess the training or skill of a rheumatologist but, nevertheless, undertook treatment of a complicated pregnancy which requires special skill and training not possessed by the defendant, the defendant must be held to the standard of care exercised in the field in which he has claimed to be qualified.

¶9. In *Lewis*, the physician involved was a general family doctor who undertook treatment of a complicated orthopedic injury. *Id.* at 830-31. The doctor initially told the patient that he could achieve a good result. *Id.* at 831. It was not until several unsuccessful attempts to treat the injury that the doctor suggested the patient seek treatment from an orthopedic surgeon. The court found this suggestion to be qualified due to the physician's initial representation that he could obtain a good result for the patient. *Id.* The court held that the physician could be held to a higher standard of care because he had told the patient that he could treat the injury. *Id.*

¶10. In the case at bar, the testimony is uncontradicted that while in the delivery room, Dr. Sanders told Kay, "I'm your lupus doctor." This statement was made in response to Kay's request for lupus medication and the need for a lupus doctor. The testimony of the four expert witnesses, two for each side, contradicts drastically in the need for a rheutamologist's involvement during Kay's pregnancy and delivery. Dr. Jean Gispen, Kay's rheumatologist, testified that although "it was not her first choice of management" she agreed that Kay could keep in touch with her via telephone during the pregnancy. At trial, Dr. Gispen testified that Dr. Sanders should have given Kay a dose of steroids immediately following the delivery to prevent any risk of a lupus flare. Dr. Gispen further stated that Kay's symptoms after the delivery were indicative of a lupus flare and Dr. Sanders should have treated them as such. Dr. Michael Cardwell testified that Dr. Sanders breached his standard of care because he did not actively co-manage Kay's pregnancy with a rheumatologist and did not administer steroids after her delivery. However, experts for the defendants testified that this care was not necessary and that the steroids could have proven harmful because steroids often inhibit the ability of antibiotics to treat infections that may arise.

¶11. The Mississippi Supreme Court addressed this identical issue in *Turner v. Temple*, 602 So. 2d 817, 823 (Miss. 1992). In *Turner*, the plaintiff, relying upon *Lewis v. Soriano*, argued that the trial court erred in refusing to instruct the jury that the defendant physician, an orthopedic surgeon, should have been held to the standard of care of a neurosurgeon. *Id.* The supreme court affirmed the trial court's decision because the information contained in the refused jury instruction was given in another instruction which was granted. Jury instruction P-21 instructed the jury that "failure to obtain a neurosurgical consult" could have been a breach of the physician's standard of care as an orthopedic surgeon. *Id.*

¶12. *Turner* can be distinguished from the case at bar because the jury instructions in this case did raise the

issue as to whether Dr. Sanders's failure to obtain a rheumatologist consult was a breach of the applicable standard of care. The jury was only instructed concerning the minimal standard of care for a doctor specializing in obstetrics; in no way was the jury instructed that Kay's lupus could have mandated that Dr. Sanders act differently as a specialist treating a patient with lupus.

¶13. More recently our supreme court has addressed this issue in *West v. Sanders Clinic for Women*, 661 So. 2d 714 (Miss. 1995). In *West,* the plaintiff brought suit against several doctors for their failure to diagnose a cancerous lump. *Id*. at 718. The jury returned a verdict for the defendants. On appeal, West argued that two of the defendants should have been held to the standard of care of oncologists because they undertook to treat her cancer. *Id.* The doctors in question were board certified internists. *Id*. The court affirmed the trial court's refusal to grant a jury instruction concerning the heightened standard of care. *Id.*

¶14. This case differs from the one at bar because the doctors in question made an unqualified referral that the plaintiff seek a second opinion from a major medical center specializing in oncology. *Id*. Dr. Sanders made no such referral to Kay; in fact, he assured her that "he was her lupus doctor." Neither, is there evidence in *West* that the doctors assured the patient that they were her "cancer doctors" and could treat her cancer.

¶15. "To have an instruction granted, the proponent must show that (1) the instruction is supported by the evidence and that (2) the instruction is a correct statement of law. *Turner*, 602 So. 2d at 823 (quoting *Copeland v. City of Jackson*, 548 So. 2d 970, 973 (Miss. 1989)). Adkins presented evidence that Dr. Sanders explicitly told Kay he was her lupus doctor. There was testimony that Dr. Sanders was negligent in his care of Kay's lupus. The requested instruction should have been given and the jury allowed to determine if the evidence presented was sufficient to find that Dr. Sanders told his patient he could achieve a good result and assumed duties of a specialty other than his own. *Lewis*, 374 So. 2d at 831. This error was fatal and we must reverse and remand for new trial.

### III. DID THE TRIAL COURT ERR IN ALLOWING A PATIENT OF DR. SANDERS'S TO BE PLACED ON THE JURY?

¶16. Although the above error is sufficient to end discussion of this case, we will address this third issue because of the importance of competent and impartial juries to our legal system. Adkins argues that the trial court erred in failing to excuse for cause juror number 22, Ms. Palmer. Ms. Palmer was a patient of Dr. Sanders and he delivered her two children. Following *voir dire*, Adkins's counsel began to name the potential jurors she wanted excused for cause. When the trial court refused the first two challenges, she made a general motion to remove from the jury any person who had a baby delivered by Dr. Sanders or physicians at the Sanders Clinic for Women, making specific mention of Ms. Palmer. The court denied this motion and stated that members of the jury panel who were patients of Dr. Sanders or the Sanders Clinic for Women would not be excused for cause if these individuals indicated to the court that they could be fair and impartial.

¶17. "The circuit judge, as he must, has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause." *Scott v. Ball*, 595 So. 2d 848, 849 (Miss. 1992). However, this discretion must be tempered by the judge's absolute duty to see that the jury empaneled is fair, impartial and competent. *Id*. "[T]rial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." *Id*. (quoting *Hudson v. Taleff,* 546 So. 2d 359, 363 (Miss. 1989)).

¶18. In *Scott v. Ball* the plaintiff filed a wrongful death action against her deceased husband's physician. *Scott*, 595 So. 2d at 849. The plaintiff alleged that the physician committed medical malpractice by failing to diagnose and treat her husband's myocardial infarction. *Id.* Scott's counsel challenged for cause twelve potential jurors based on *voir dire* responses that they or members of their family had relationships with Dr. Ball or other physicians in his clinic. The court excused seven of the five jurors. *Id.* The jury returned a verdict for the defendants. On appeal, Scott argued that the four peremptory challenges allotted by statute were not sufficient to excuse all potential jurors the judge should have excused for cause. *Id.*

¶19. The court looked to the earlier case of *Hudson v. Taleff* for guidance on the issue. In *Hudson*, the plaintiff appealed a jury verdict for the defendants in a medical malpractice action. *Hudson*, 546 So. 2d at 359. Hudson argued on appeal that she did not receive a fair and impartial jury because the trial judge did not excuse for cause potential jurors who had some connection to the defendant physician. *Id.* at 361. The court stated that "[r]espect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for "public confidence in the fairness of jury trials is essential to the existence of our legal system." *Id.* at 362 (quoting *Lee v. State*, 226 Miss. 276, 286, 83 So. 2d 818, 821 (1955). The court stated that the trial judge could have given additional peremptory challenges, could have increased the size of the available venire as well as affording additional challenges, or he could have sustained at least some of the challenges for cause. *Id.* at 363.

¶20. Following the dictates of *Hudson*, the *Scott* court held "[w]hen a rational challenge is made by a party to a prospective juror, and other jurors against whom no challenge is made are available, the circuit judge should excuse the challenged juror." *Id.* at 850. The court noted that if the judge had excused all challenged jurors, there would have been a sufficient number of jurors remaining to fill the panel. The court stated, "[i]n a suit in which a physician is a party, a circuit judge must be sensitive to the qualification of a juror who has himself or herself been treated by him, or whose family members have at one time or another been patients of his." *Id.*

¶21. The case of *Davis v. Powell*, 781 So. 2d 912 (Miss. Ct. App. 2000), is also informative on this issue. In *Davis*, the plaintiff challenged for cause some eighteen potential jurors based upon the fact that they or their close family members were patients, relatives or employees of the defendant doctor in the case. *Id.* at (¶9). The court denied all the challenges except one. Because the court refused the challenges, the plaintiff had to use her peremptory strikes to excuse four jurors. *Id.* at (¶10). After the peremptory strikes, fourteen jurors who were challenged for cause were left; five of these jurors were eventually placed on the jury. *Id.* at (¶13). This Court found the trial court's refusal to strike the jurors for cause to be reversible error. *Id.* at (¶21).

¶22. Finally, in *Brown v. Blackwell*, 697 So. 2d 763 (Miss. 1997), the trial judge allowed both parties unlimited challenges to potential jurors with any connection to the defendant or his clinic. *Id.* at 770. On appeal, Brown argued that the trial court improperly applied the dictates of *Hudson v. Taleff*. She maintained that she did not receive a jury of her peers because all jurors who were or had family members who were patients of Dr. Blackwell were excused for cause. *Id.* at 769. The Mississippi Supreme Court stated that the judge's use of unlimited challenges for cause for potential jurors with any connection to the clinic was appropriate and "in fact, it is hard to imagine more proper compliance with the mandates of [*Hudson*], or with our subsequent decision in *Scott*." *Id.* The court noted that regardless of a potential juror's absolute sincerity in his impartiality, in the majority of cases, human nature will cause him to be "more than reluctant to return a verdict against the physician." *Id.* at 771 (quoting *Scott*, 595 So. 2d at 850.).

¶23. In this case, the trial judge refused to excuse for cause any of the potential jurors who were either patients of Dr. Sanders or close family members of patients of Dr. Sanders and/or the other physicians at his clinic if the jurors indicated that they could be fair and impartial despite the relationship with the defendants. Two of the potential jurors Adkins moved to have excused for cause first replied that they would find it difficult to be impartial because the respective jurors were either a patient of Dr. Sanders or the spouse of a patient. After further questioning by the judge, both replied they would be able to set aside any bias caused by the relationship with the defendant. The judge stated that he would rely on those statements. Counsel for Adkins used her four peremptory strikes to excuse potential jurors with close relationships to the defendants, including the two above mentioned jurors. The statutory allotted number of peremptory strikes were not sufficient to prevent Ms. Palmer, a patient of Dr. Sanders, from being placed on the jury.

¶24. We hold that the trial court should have excused for cause all potential jurors who were either patients or had family members who were patients of the defendants. Of the three hundred fifty people originally summoned to jury duty in this case, one hundred eight appeared. Of these, twenty-eight were excused for various reasons before *voir dire*. The judge then excused another twenty-three for cause leaving approximately sixty people for selection to the jury. The judge could have granted the challenges for cause without diminishing the number of potential jurors to empanel a fair, impartial and competent jury. This case is reversed and remanded for new trial.

¶25. **THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS REVERSED AND REMANDED. COSTS ARE ASSESSED TO THE APPELLEES.**

**McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, IRVING, MYERS AND BRANTLEY, JJ., CONCUR.**