# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CT-00765-SCT

*AMANDA J. (GRASSELL) BERMUDEZ SCHMIDT*

*v.*

*BRIAN S. BERMUDEZ*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 03/31/2006 |
| TRIAL JUDGE: | HON. GLENN ALDERSON |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOE MORGAN WILSON |
| ATTORNEYS FOR APPELLEE: | SARAH JEAN LIDDY |
| | JUSTIN STRAUSS CLUCK |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | REVERSED AND REMANDED - 03/05/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**.

**DICKINSON, JUSTICE, FOR THE COURT:**

*Preliminary statement.*

¶1.     We wish to emphasize at the outset that today's opinion should not be read as an infringement on a trial judge's authority and responsibility to control his or her courtroom. Nor should it be read as an attempt to discourage trial judges from taking reasonable actions to ensure fairness, such as asking questions of witnesses. As appellate judges, we perform our duties far from the smoke and fire of the courtroom battles faced daily by trial judges.

Thus, we owe substantial discretion to their decisions, particularly when they encounter difficult attorneys and witnesses. However, as with all things of this world, there are limits.

¶2.     Of a trial judge's numerous duties, the one which overshadows all others; the one which must be closely guarded and carefully protected, is the duty to ensure that all litigants receive a fair trial before an impartial tribunal. Every rule of professional and judicial conduct is aimed directly at that goal.

¶3.     During the trial of this custody dispute, the chancellor took over the questioning of the defendant. Unhappy with her answer to one of his questions, the chancellor informed the defendant that she had "diarrhea of the mouth." Because of this, and other abusive and inappropriate conduct, we conclude that the defendant did not receive a fair trial before an impartial tribunal, and we remand for a new trial before a different chancellor on all issues.

## BACKGROUND FACTS AND PROCEEDINGS[1]

¶4.     Because our disposition of this case rests on the chancellor's conduct rather than the substantive questions raised, our recitation of the substantive facts will be brief, and we shall concentrate primarily on the events which took place at trial.

*Prior to trial.*

¶5.     Brian Bermudez and Amanda J. Bermudez Schmidt were granted a divorce by the Marshall County Chancery Court. The parties agreed to share custody of their minor son, with Schmidt having primary physical custody. When Schmidt suspected that Bermudez had physically abused the minor son, she denied him visitation on a few occasions.

---

[1]A more detailed recitation of the facts may be found in the Court of Appeals' decision in *Schmidt v. Bermudez* 2008 Miss. App. LEXIS 36, *2-14 (Miss. Ct. App., Jan. 15, 2008).

¶6.     When Schmidt decided to move to Colorado, Bermudez filed a petition requesting that Schmidt be held in contempt of court for denial of visitation, and that custody be modified because Schmidt's proposed move to Colorado created a material change in circumstances.

*The trial.*

¶7.     In discussing the events which took place, and the chancellor's conduct at trial, the Court of Appeals stated:

> Schmidt contends that the chancellor's improper remarks to her and her witnesses demonstrate that the chancellor was unquestionably biased against her. Schmidt avers that, had she known before trial about the chancellor's bias, she would have filed a motion for recusal. Although we find no reversible error on this point, *we agree that the chancellor's remarks were clearly improper.*
>
> From the beginning of the trial, the chancellor indicated that he believed that Schmidt and her husband had lied during prior proceedings. During a hearing on Schmidt's motion to reconsider the court's decision regarding jurisdiction, the chancellor stated the following:
>
>> Well, let me tell you what troubles me. I remember this case and I remember a doctor, he is in this courtroom today. He took the witness stand and denied emphatically under oath that he was having an affair with your client. He is now married to her. That's perjury. This thing has really got me concerned. And I'm telling you lawyers now, I'm not rendering an opinion today. I'm going to have the court reporter to transcribe some of these hearings, and my main concern is the welfare of this child and the environment this child is in. If this child -- if this child is in the home of somebody that takes an oath and perjures themselves that child shouldn't be there. I'm going to look at it and I'm going to look and see, and if I determine it has been then I'm going to turn it over to the grand jury. But I'm going to look at this thing, I know what the law is.
>
>> * * * *

3

> Well, I know a doctor that lied to this court, in my opinion, and I'm going to look at it.

However, the chancellor apparently never submitted anything to a grand jury, and the record does not include any transcript of the hearing that the chancellor is referring to. Regardless, the chancellor continued to refer negatively to Schmidt's alleged perjury, repeatedly telling her that she had already lied to the court before. Bermudez called Schmidt as a hostile witness, and during Schmidt's cross-examination by Bermudez's attorney, Schmidt incorrectly stated that she and Dr. Schmidt moved in together in March 2005. After being shown a document by Bermudez's attorney, Schmidt agreed that it was actually March 2004. The chancellor, however, felt the need to berate Schmidt:

> [THE COURT]: You listen to me, I want you to hear me. You committed perjury in this court and your now husband committed perjury in this court. Now, if you commit perjury during in [sic] this trial you are going to leave this courtroom in handcuffs, do you understand me?
>
> [SCHMIDT]: Yes, sir.
>
> [THE COURT]: You've lied to this Court before. Now, she just asked you when did you move in with Dr. Schmidt, and you said March of 2005, and she said wasn't it 2004. Now, let me tell you, your memory is not that bad. So don't -- you wait and you let me finish. Now, don't you start playing games with this Court, you have lied to this Court for the last time. I'm giving you fair warning. Now, go forward.

Given that the chancellor had apparently either not had the hearing at issue transcribed or had had it transcribed and found nothing to indicate perjury, the chancellor's statements to Schmidt were highly inappropriate. When corrected by Bermudez's attorney, Schmidt did not continue to insist that she moved in with Dr. Schmidt in 2005. The chancellor's badgering of Schmidt regarding her mistake was improper. Even after Schmidt indicated that she understood the court, the chancellor continued to belittle and threaten her. In short, the chancellor's conduct was inexcusable.

Unfortunately, the chancellor's misconduct was not limited to repeatedly questioning Schmidt's honesty. The chancellor also continually questioned Schmidt regarding what proof she had to show - even though the court was

well aware that Schmidt was being questioned as a hostile witness during Bermudez's case-in-chief and, therefore, was not yet required to present her case. While Schmidt may have been unfamiliar with when her proof regarding certain items would be offered, the chancellor clearly knew that she had yet to present her case. Regardless, the court continually badgered Schmidt during her cross-examination regarding what evidence she would be presenting. The transcript reveals the following exchange:

[THE COURT]: Do you have any medical proof that's going to be before the Court today?

[SCHMIDT]: Not today, your Honor. What kind of medical proof?

[THE COURT]: Do you have a pediatrician that is going to testify as to the abuse of your son?

[SCHMIDT]: No, a psychologist.

[THE COURT]: Well, they are a dime a dozen some of them, some of them are good. Do you have a pediatrician?

[SCHMIDT]: No, sir.

[THE COURT]: What evidence do you have?

[SCHMIDT]: Just a few things [my son] has said.

[THE COURT]: Well, tell me.

[SCHMIDT]: He -- he came out of -- you will have to ask one of the witnesses, Ginger, who was in the bedroom with him and she was watching him.

[THE COURT]: Well, tell me -- tell me what makes you suspect sexual abuse?

[SCHMIDT]: Well, I don't suspect necessarily sexual abuse.

[THE COURT]: Well, you said it could -- could happen.

5

[SCHMIDT]: Well, anything could happen, but, you know, he said, I want to get in the bed with you naked like I do with my daddy. He said that to Ginger Giles.

[THE COURT]: I think that you are sick right now, the way you are doing.

[SCHMIDT]: Sir, if you want to ask Mrs. Giles that.

[THE COURT]: Pardon?

[SCHMIDT]: Mrs. Giles is the one that witnessed that, she is the one that told me that.

Rather than wait until Schmidt presented her evidence and witnesses, the chancellor badgered her with questions regarding what evidence she was going to present. When Schmidt told him that she had a psychologist who was going to testify, the chancellor essentially told her that he considered the testimony highly suspect – even though he had not yet heard it. This course of conduct is neither courteous to the witness nor in the best interest of judicial economy.

Beyond the specific problems that we have already pointed out, the chancellor constantly degraded and belittled Schmidt and her other witnesses:

[THE COURT]: Why didn't you put the father down in case of emergency?

[SCHMIDT]: It was bad judgment on my part, your Honor.

[THE COURT]: Well, you are going to have to explain it to me better than that. Why didn't you put the father down?

[SCHMIDT]: Bad judgment. I was afraid to.

[THE COURT]: You what?

[SCHMIDT]: I was afraid to.

[THE COURT]: Why?

6

[SCHMIDT]: Due to the fact that he had been abusive during the marriage, I was afraid that he -- and -- and during -- before the temporary hearing that we had before the divorce, they had taken the child and had to file a police report because they would not return the child to me -- the grandparents -- had to file and had Brian to get off of work before the -- when I went to pick him up he wasn't there, and they refused to bring [my son] back and the police said they couldn't do anything about it because there were no orders, and I was afraid that the same thing was going to happen again. That he would pick up [my son] and that I would never see my child again.

[THE COURT]: Do you expect me to believe that?

[SCHMIDT]: Yes, sir.

[THE COURT]: The reason I asked you that, why did you sign an agreement and why did you agree for your husband or ex-husband, he is now, to have joint legal custody in your divorce less than a month earlier, if you were worried about that, why did you agree?

[SCHMIDT]: I wanted to get it over with, the divorce. I was ready to stop fighting.

[THE COURT]: Well, I'm going to be honest with you, in reading the file it appears to me that you have schemed every way you can to keep this child away from the father from the very beginning up to this present date.

[SCHMIDT]: No, sir.

[THE COURT]: Well, you are not helping yourself unless you can give me a better answer than what you just gave me.

[SCHMIDT]: There is no -- there is nothing else that I can say that -- other than it was a bad judgment on my part, I am not trying to keep [my son] away from his father. I want him to have a good relationship with his father.

* * * *

7

[THE COURT]: And then your attorney told you what?

[SCHMIDT]: To take the child to see a child psychologist to let her make that -- that expert make that determination.

[THE COURT]: Why a psychologist for a three-year-old child?

[SCHMIDT]: I'm not sure that was just her recommendation.

[THE COURT]: It sounds like she needs a psychologist.

* * * *

[THE COURT]: Forget the Tennessee court. This Court has jurisdiction. Why isn't the abuse before this court now? The abuse that you alleged in your Tennessee petition, why hadn't you brought that before this court?

[SCHMIDT]: I have asked my attorney that question, I don't believe that this court has jurisdiction over this matter because we were all living in Tennessee for a year-and-a-half before this happened.

[THE COURT]: Did you understand what I asked you? I didn't ask you what you believed. I asked you why you have not brought it before this court. The allegations of abuse?

[SCHMIDT]: On the advice of my attorney.

[THE COURT]: All right. Tell me that to begin.

* * * *

[SCHMIDT]: No, sir. Mostly the bruises and everything has been come [sic] to a halt since we have been in court. The direct words from Brian's mouth to me was, I know how it hurt you, the bruises --

[THE COURT]: -- Well, you know, I didn't ask you that. You are letting your mouth run away. I wish you would answer the

8

questions I asked you. I'm wanting to know about medical proof. Do you have any? I'm concerned about this child.

[SCHMIDT]: I have -- I have --

[THE COURT]: -- Because if this child. Just a moment. I'm concerned, because if this man has been abusing this child I will stop him from seeing this child, because this is a baby and this baby is not going to be abused. But if you've got fantasies in your head about the abuse you've got a problem. And so I've got to try and get to the bottom of it.

* * * *

[THE COURT]: Well, just a moment. Just a moment. During that period of time did you deny the visitation?

[SCHMIDT]: I believe I denied some of the visitation.

[THE COURT]: Don't give me I believe, did you deny it or not deny it?

[SCHMIDT]: I think I did. Yes, sir.

[THE COURT]: Don't give me things, [sic] "yes or no." I'm not -- I'm not trying to be nasty but you are hedging, did you deny visitation or did you not deny visitation?

[SCHMIDT]: Sir, without looking back I cannot honestly answer that question.

[THE COURT]: Well, you aren't prepared for this trial then if you have not got that information with you. Go ahead. I will take it that you denied it.

* * * *

[THE COURT]: Just a moment. Just a moment. Let her answer? Mrs. Schmidt, did he have ten days visitation in January of 2005?

9

[SCHMIDT]: I'm not sure. I'm not sure.

[THE COURT]: Now, you listen to me for a minute. I've got to make a decision on the welfare of this child, and when you say "I'm not sure" I'm taking it as no.

[SCHMIDT]: Okay.

[THE COURT]: Now, then, this is 2006, you know. Now, then, you can either testify or not testify. Now, then answer her question if you can.

* * * *

[THE COURT]: No, we are not talking about that. I think the order was specific. The order gave no lead way [sic] to anybody. Now, what is your reason?

[SCHMIDT]: Your Honor, you know this child has been through a -- a lot. He has suffered a lot from this. On top of that in [sic] my belief that he has continued to be emotionally affected substantially and the fact that my only income is child support, I don't have the money to fly him to and from three-round trip [sic] tickets every single month for visitation.

[THE COURT]: Did you think about that when you moved to, where is it, Colorado?

[SCHMIDT]: No, sir, I didn't because I expected to work. And then when we moved shortly thereafter I got pregnant and was very sick with the pregnancy. And now --

[THE COURT]: -- Well, did you address the Court, have you petitioned the Court and tell [sic] the Court that you was [sic] financially not able to do it?

[SCHMIDT]: I thought we had petitioned the Court that I was not financially not [sic] able to do it. And I thought my attorney did file the petition.

10

[THE COURT]: The thing that troubles me, is you have been doctor and you have been judge through this whole ordeal.

[SCHMIDT]: I'm sorry, sir.

[THE COURT]: You have been playing the role as judge and doctor. You have been diagnosing the injury, so-called injury to your son, but yet -- yet you have no doctors here to testify. You have been interpreting the judge's orders to your satisfaction.

[SCHMIDT]: Your Honor, I'm doing -- I'm doing to the best of my ability to get this child the help that he needs, and the visitation that is with his father that can be afforded.

[THE COURT]: But you are not respecting the Court orders and never have. That's what is troubling to me. Why?

[SCHMIDT]: I'm very concerned about my son.

[THE COURT]: I'm very concerned about you. I'm going to be honest with you, I really am.

[SCHMIDT]: I'm concerned about his well-being. All of this hostility and all of this --

[THE COURT]: Well, why can't you follow a Court order?

[SCHMIDT]: I'm scared for him and I am scared for myself.

[THE COURT]: Well, tell me why are you scared for your son?

[SCHMIDT]: I am scared for my son because I am scared that they have not -- they have held him longer than supposed to [sic]. They have threatened to keep him. He comes home in -- in an emotional wreck and rage where he was hospitalized in the psychiatric unit in the hospital when he was three years old. And this is all very heartwrenching to me.

[THE COURT]: Now, let me tell you something, I'm 66 years of age, I come from a family of seven children. We have a family get-together and it's about 75 or 80 people there, our

11

family is so large, and you are trying to tell this Court that a three year old has psychological problems and has to go to a psychiatrist?

[SCHMIDT]: Yes, sir.

[THE COURT]: Lady, something is wrong. I have seen something is wrong with you. There is no way a three year old is going to have that [sic] kind of psychological problems with no more than I've heard about today. You have -- you have brought me no medical, [sic] you have brought me nothing.

[SCHMIDT]: Well, we have --

[THE COURT]: -- You have brought me innuendos.

* * * *

[THE COURT]: So why couldn't you come to the court hearing rather than go to North Carolina, that is some 300 miles closer?

[SCHMIDT]: I was told that it wasn't going to be a final hearing and that I wasn't needed to be here.

[THE COURT]: Judge Schmidt again. Go ahead.

* * * *

[THE COURT]: Well, just a moment. Why under God's green earth did you ever sign that Separation Agreement and that Property Settlement Agreement and that Child Custody Agreement and that Visitation Agreement if all of this was happening? Why?

[SCHMIDT]: Your Honor, I regret that every single day.

[THE COURT]: I didn't ask you, I asked you why?

[SCHMIDT]: I wanted -- I was afraid for my whole life.

12

[THE COURT]: You wanted out of a marriage to marry your sweetie and get out of dodge, that's what it boiled down to.

[SCHMIDT]: No, sir, I did not.

[THE COURT]: Well, give me an explanation.

[SCHMIDT]: I was scared for my life from him, from Mr. Bermudez, he had threatened me, he has threatened to kill himself, he has threatened to kill me. He has the -- the means and the ways to do it. And I wanted out -- out of it for that reason alone. And I was scared, and I was scared but I, in my heart, did not want to believe that he would do the same thing that he had done to me to a child, to a baby.

[THE COURT]: Lady, lady, you get diarrhea of the mouth when I ask you a simple question. Now, then, tell me in simple terms why you signed that agreement, knowing that this man had all of those propensities, why did you sign it?

[SCHMIDT]: I just wanted out.

[THE COURT]: So he was that bad, and so you are telling the Court that you were willing to sacrifice the sanity and the safety of your child to this brutal beast to get out of that situation, is that what you are telling the Court?

* * * *

[THE COURT]: How do you know that?

[SCHMIDT]: Because his psychologist in the hospital and the psychiatrist have told me that. When he goes there he can pull it together and hold it together until he comes home and let's [sic] it all out, because he's been holding it in for so long.

[THE COURT]: I think you've got a psychologist with a yo-yo head.

* * * *

13

[THE COURT]: Are you the one that has the problem?

[SCHMIDT]: No, sir.

[THE COURT]: Have you -- Well, what type of medication are you on again?

[SCHMIDT]: Antianxiety and antidepressants.

[THE COURT]: You are playing the role very well.

As the preceding excerpts show, the chancellor insulted and badgered Schmidt repeatedly during her cross-examination, before she had even had a chance to present her case. Oftentimes, when Schmidt attempted to give simple answers to questions from the court, such as that she signed her divorce agreement with Bermudez because she was afraid, the chancellor rejected her answer and asked her to explain further. Yet, in that particular instance, when Schmidt attempted to explain, the chancellor promptly told her that she had "diarrhea of the mouth." The chancellor also repeatedly insulted the professionals that Schmidt said she had consulted, saying that one had a "yo-yo head" and that another needed the help of a psychologist. When the chancellor did not berate Schmidt for giving too long of an answer, he often instead sniped at her, saying that she was attempting to function as judge and doctor in the case. During one of these incidents, Schmidt clearly indicated that her attorney had told her that she did not need to be present at a certain hearing, and the chancellor rudely responded, "Judge Schmidt again."

Furthermore, when Schmidt's expert witness, Dr. Kelly, testified, the chancellor threatened to arrest Dr. Kelly when she stated that she had to leave shortly or she would miss her flight back home. The following exchange transpired:

[DR. KELLY]: Okay. Well, I have a flight that leaves at 4:30 from the airport.

[THE COURT]: Yes, ma'am, but you will leave when testimony is through.

[DR. KELLY]: Even though we didn't start at -- I wasn't the first one this morning?

14

[THE COURT]: Get me a deputy. Get me a deputy, I'm not going to put up with this. Get me a deputy.

While Dr. Kelly might have erred in questioning the court's ruling, her questioning of the ruling, in light of the fact that she was not allowed to testify earlier in the day, hardly deserved cries from the chancellor for someone to "get me a deputy" so that Dr. Kelly could be arrested. Clearly, the chancellor could have handled the situation in a more mature and professional manner.

*Schmidt v. Bermudez*, 2008 Miss. App. LEXIS 36, *14-30.

¶8.     In addition to concerns expressed by the Court of Appeals, we also note that, at one point, the chancellor stated to Schmidt:

> [THE COURT]:  Lady, it appears that you poisoning – that you are taking poison and pouring on your child --
>
> [SCHMIDT]:  – No, sir[.]
>
> [THE COURT]:  – against his paternal family.
>
> [SCHMIDT]:  No, sir.
>
> [THE COURT]:  I – wait, now you let me talk for minute.  Everything that's come out this morning and this afternoon has been venom from you, and you cannot give me any foundation for it.  I want you to give me some foundation.

¶9.     After a hearing on all issues, the chancellor transferred custody from Schmidt to Bermudez and ordered Schmidt to pay child support.  The chancellor also held Schmidt in contempt and ordered her to pay Bermudez $2,682.54 for attorney's fees and airplane tickets.

*Post-trial.*

¶10.   Schmidt appealed the chancellor's decision on various grounds including that, throughout the proceedings, the chancellor showed "an extreme bias" toward Schmidt.  The

15

appeal was assigned to the Court of Appeals, which found the chancellor's conduct clearly improper but harmless. *Schmidt v. Bermudez*, 2008 Miss. App. LEXIS 36, * 14-30. Schmidt moved for rehearing, which the Court of Appeals denied. *Schmidt v. Bermudez*, 2008 Miss. App. LEXIS 335 (Miss. Ct. App., June 3, 2008). Schmidt then filed a petition for writ of certiorari, which we granted.

## ANALYSIS

¶11. Firmly established in our federal and state constitutions, and in our jurisprudence, is the requirement that our courts provide litigants a fair, impartial tribunal. The Fourteenth Amendment to the United States Constitution prohibits the State (including its courts) from depriving "any person of life, liberty or property, without due process of law. . . ." U.S. Const. amend. XIV, § 1. The same requirement is found in the Mississippi Constitution. Miss. Const. art. 3, § 14. The Mississippi Constitution also provides that our courts "shall be open, and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay." Miss. Const. art. 3, § 24.

¶12. The constitutionally-required oath of office for judicial officers in the State of Mississippi provides as follows:

> I,_____, solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as _____, according to the best of my ability and understanding, agreeably to the Constitution of the United States and the Constitution and laws of the State of Mississippi, so help me God.

16

Miss. Const. art. 6, § 155.

¶13.    Although speaking of jury trials, this Court pronounced the following principle, which is equally applicable to trials before the court without a jury:

> Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for "public confidence in the fairness of jury trials is essential to the existence of our legal system.  Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions."

*Hudson v. Taleff*, 546 So. 2d 359, 362-63 (Miss. 1989) (citing *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985) (quoting *Lee v. State*, 226 Miss. 276, 83 So. 2d 818 (1955))).

   *Code of Judicial Conduct.*

¶14.    The issue before us today does not require that we determine whether violations of the Code of Judicial Conduct occurred.  Such determinations are made by this Court only after review by the Judicial Performance Commission.  *See* Miss. Const. art. 6 Section 177A.  Our review of the canons is appropriate, however for the purpose of determining whether the trial court deprived Schmidt of a fair trial.

¶15.    Canon 3(E)(1)(a) of the Code of Judicial Conduct requires disqualification of a judge when his or her "impartiality might be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the Proceeding."  The question to be determined is whether "a reasonable person, knowing all the circumstances, [would] harbor

17

any doubts about the judge's impartiality?" ***Bredemeier v. Jackson***, 689 So. 2d 770, 774 (Miss. 1997) (citing ***Frierson v. State***, 606 So. 2d 604, 606 (Miss. 1992)).[2]

¶16.     Canon 1 of the Mississippi Code of Judicial Conduct states that a judge "should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved." Canon 2A further provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Moreover, Canon 3(A)(3) states: "Judges shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacities . . . . "

¶17.     Although we agree with the Court of Appeals' conclusion that the chancellor's conduct was clearly improper, we cannot agree with its conclusion that such conduct was "harmless error." ***Schmidt v. Bermudez***, 2008 Miss. App. LEXIS 36, *32 ("[W]e cannot find that the chancellor's improper conduct affected a substantial right of the parties.").

¶18.     Justice Randolph, writing for this Court in ***Mississippi Commission On Judicial Performance v. Judy Case Martin,*** stated:

> We believe our judicial system is more just and fair than any legal system
> which presently exists, or for that matter, which has ever existed in the history
> of civilization preceding our experiment in democracy. Yet at the same time,
> the system is not perfect. Judges are human, and as such, do on occasion err.

---

[2]The record before us does not contain a motion to recuse. Schmidt argues that it was impossible to move for recusal because the chancellor's personal bias was not evident until the case was tried in its entirety.

Ultimately, it is this Court's constitutional duty to separate honest errors of a judge from willful misconduct, wrongful use of power, corruption, dishonesty, or acts of moral turpitude which negatively reflect upon the judicial branch of government.

*Martin*, 921 So. 2d 1258, 1263 (Miss. 2005).

¶19.   As is amply clear from the transcript in this case, the chancellor was so combative, antagonistic, discourteous, and adversarial to Schmidt that no reasonable person, knowing all the facts, could conclude that Schmidt was afforded a fair trial. This Court previously has recognized that "some misconduct is so egregious as to require no definition to identify it," and that "[e]lected members of the Judiciary have a duty to conduct themselves with respect for those they serve, including the court staff and the litigants that come before them." *Miss. Comm'n on Judicial Performance v. Spencer*, 725 So. 2d 171, 178 (Miss. 1998). In the case before us today, the chancellor's intemperance with Schmidt would leave any reasonable person with doubts about his impartiality. *Bredemeier*, 689 So. 2d at 774.

¶20.   Lastly, Rule 61 of the Mississippi Rules of Civil Procedure states:

No error in either the admission or the exclusion of evidence and no error in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

¶21.   Here, the chancellor's conduct was wholly inconsistent with substantial justice. Schmidt was not afforded a fair trial. Therefore, we must reverse and remand for a new trial before a different chancellor.

## CONCLUSION

¶22.　The record clearly evinces the chancellor's extreme bias and prejudice against Schmidt. Because we find that Schmidt did not receive a fair trial, we reverse the judgment of the Court of Appeals, reverse the judgment of the Chancery Court of Marshall County and remand for a new trial on all issues before a different chancellor.

¶23.　**REVERSED AND REMANDED.**

　　**WALLER, C.J., CARLSON AND GRAVES, P.JJ., RANDOLPH, LAMAR, KITCHENS AND PIERCE, JJ., CONCUR. CHANDLER, J., NOT PARTICIPATING.**

20